h JONES, J.
The plaintiffs/appellants, Christy Sal-vant, as mother and natural tutrix of the minor child Shawn Lewis Jr., and his father, Shawn Lewis Sr., seek review of a district court judgment which dismissed the appellants’ medical malpractice suit with prejudice. We reverse.
Statement of the Facts
This is a medical malpractice action arising out of the birth delivery of Shawn Lewis, Jr., on July 31, 1998, at the University Medical Center in New Orleans, Louisiana. The defendants are the State of Louisiana, the Board of Supervisors of the Louisiana Agricultural and Mechanical College, the Louisiana State University Medical Center at New Orleans, the Medical Center of Louisiana at New Orleans through the Health Services Division, Dr. Bernadette Jones Meadors [1], Dr. Emanuel Javate, and Dr. Seyed Abas Shoebieri.
In their Petition for Damages, the plaintiffs allege that during the baby’s delivery, a specific type of complication, known as “shoulder dystocia,” occurred. |aA shoulder dystocia is best explained as a situation which occurs after the child’s head delivers successfully, but the shoulders won’t deliver due to one — or both — shoulders being stuck, or rather “impacted,” behind or on certain anatomical structures. When this situation occurs, certain maneuvers are recommended to free the shoulder from the obstruction. However, until the shoulders are freed, it is generally held that simply pulling on the baby’s head in an attempt to free the shoulder is not recommended, as other injuries may occur. Shoulder dystocia is considered a medical *949 urgency because the child may not be able to breathe on his own due to the compression which occurs during this period.
The record indicates that Ms. Salvant’s entire term of pregnancy was normal. That is, the ultrasounds indicated normal fetal growth and development. There were no intrauterine or other abnormalities noted. Prior to Ms. Salvant’s admission to the hospital, the entire pregnancy had been uneventful and without complications. When she presented to the hospital to deliver the baby, she was experiencing labor pains and had ruptured membranes.
During delivery, the attending physician was Dr. Javate. Dr. Javate was a first year medical resident who had only worked in the OB/GYN department for about one month. In addition to. Dr. Ja-vate, the staff also included Nurse Dawn Cortie Boudreaux. Nurse Boudreaux was responsible for attending to the mother and child during and after the delivery. She was also responsible for bringing the infant to the nursery, post delivery.
When Ms. Salvant was fully dilated, she was instructed to start pushing, first by a nurse and subsequently by a doctor. However, Ms. Salvant indicated that after the baby’s head was delivered, she heard someone yell “stop” at least twice. She does not recall who shouted the command. At or around the same time, Dr. pSyed Shoebieri and Dr. Meadors, entered the delivery room after being called by the nurse.[2] Dr. Shoebieri, who was the most senior resident, took over the delivery and freed the infant’s shoulder.
Post delivery, the baby was brought to Ms. Salvant and she noticed that the child’s arm was “helpless.” Prior to their discharge, the baby underwent physical therapy for the arm- and was later discharged on August 2,1998.
■ On August 17, 1998, ' Ms. Salvant brought her'son to the'University Medical Center due to swelling’ and redn'ess in his right shoulder, and a clicking noise in his hip. On the same date, an x-ray was taken which suggested a fracture of the middle one third of the right clavicle.
On December 17, 1998, Ms. Salvant brought her son, who was then four (4) months old, to Children’s Hospital for an appointment with Dr. Stephen Deputy, a specialist in brachial plexus injuries in children. Dr. Deputy testified that upon examination, the child could not flex his wrist or open the finger of his right hand.
Ms. Salvant then brought her son to Dr. Robert Lyons Tiel, a neurosurgeon, on July 21, 1999. Dr. Tiel, who specializes in peripheral nervous system injuries and tumors at the -L.S.U. Medical Center, ordered an EMG which later revealed “severe right brachial plexus injury related to birth trauma.”
After the consultations with Drs. Deputy and Tiel, Ms- Salvant was informed that her son suffered significant nerve damage and that surgery would be needed to repair the damage. The child was admitted to the Medical Center of Louisiana at New Orleans on August 19, 1999 for same day surgery. He was discharged the following day.
LHowever; the surgery did little to change the child’s injured arm. Home therapy exercises and prescribed physical therapy sessions also failed to improve his condition. Ms. Salvant was later advised that The child’s condition was permanent *950 and that very little, if any, additional treatment could be offered.
The plaintiffs allege in their Petition for Damages that during the child’s delivery at birth, the “pulling” of Shawn Jr.’s head, with excessive force, resulted in severe and permanent damage to his right arm. The plaintiffs allege that the force used to free the baby’s head was so excessive that it literally caused the child’s brachial plexus nerve to stretch and yanked the C-5 nerve root from the infant’s spinal cord. Hence, the alleged injuries during the delivery resulted in the loss of functionality and strength in Shawn Jr.’s right arm.
Procedural History
Ms. Salvant filed a claim with the Division of Administration, State of Louisiana, to review the case on June 21, 1999. The medical review panel, which consisted of Dr. Kevin Stephens, Dr. Felton Winfield, and Dr. Vincent Culotta, unanimously concluded that the medical team did not breach the standard of care during Shawn Jr.’s delivery. The medical review panel also concluded that Shawn Jr.’s injury resulted from a “yet unknown mechanism.” As a result of the panel findings, this suit was instituted on February 28, 2001.
Trial commenced on January 21, 2004. Our review of the lower court record indicates that Ms. Salvant testified that she was instructed to push by the nurse initially, and then by the doctor, presumably, Dr. Javate. Ms. Salvant testified that she did as the professionals instructed her to do. She remembered that a nurse was near her the entire time. She testified that once the baby’s head was | (¡delivered, the entire body was delivered some time later. However, during the period between the delivery of the head and the entire body, she distinctly remembered that someone yelled “stop” two or three times, and then another doctor entered the room. Once the child was delivered, she noticed that his arm was limp and overheard delivery personnel comment that something was wrong with the baby’s arm.
Ms. Salvant also testified that after Shawn Jr.’s birth, she was aware that physical therapy was important for his development and further testified that she had been with him in therapy everyday. However, despite her admission that she understood the importance of bringing Shawn Jr., to physical therapy, she only brought him to his prescribed therapy once. The treatment notes from the therapist reflect that Shawn Jr. did not meet his goals due to “non-compliance with therapy.”
Mr. Shawn Lewis, Sr., father of Shawn Jr., testified, but stated that he didn’t see anything.
Mrs. Wanda Lewis, the infant’s paternal grandmother and mother of Shawn Lewis, Sr., was present in the delivery room at the time of the baby’s birth. At trial, she testified that she observed two men and a woman enter the delivery room and instruct Ms. Salvant to not push until something could be placed under her. She also testified that she saw the infant’s head delivered, but then observed that an elderly doctor entered the room and yelled “stop.” This same doctor, presumably Dr. Shoebieri, then took over the delivery procedure. After the delivery, Mrs. Lewis testified, she heard two nurses say that something was wrong with the infant’s arm. Mrs. Lewis’ testimony was not disputed, as she was not cross-examined by the defendants.
1 fiDr. Deputy testified on behalf of the plaintiffs. He also indicated that he specialized in the treatment of brachial plexus injuries in children.
Dr. Deputy testified that he started seeing Shawn Jr. at Children’s Hospital on December 17, 1998. During the initial of *951 fice visit with the child, he inquired whether Shawn had any shoulder: dystocia or excessive traction because “shoulder dysto-cia is a significant risk factor for traumatic brachial plexus injuries.”
Dr. Deputy testified that upon physical examination, the child could not flex his wrist or open his fingers. He opined that this was evidence of injury to the child’s entire brachial plexus and indicated that based upon the child’s history, that the injury was most likely traumatic.
Dr. Deputy’s concluding testimony was that .the field of neurology attributes this type of injury to trauma during delivery. He explained that the trauma is produced by the head separating from the shoulder and stretching the brachial plexus nerve roots. Hence, the injury suffered by Shawn Jr. resulted from a stretching and/or pulling on the brachial plexus nerves.
Dr. Tiel, an associate professor of Neurosurgery at the L.S.U. Medical Center, testified on behalf of the plaintiffs. His specialty is the treatment of peripheral nervous system injuries and tumors, and he was accepted by the district court as an expert in the field of neurosurgery.
Dr. Tiel testified that he first saw the child when the child was ten (10) months old on July 21, 1999. On physical examination he noted that the child was born with a “flailed” arm. It was Dr. Tiel’s understanding that shoulder dystocia had been diagnosed during the child’s delivery, but an additional EMG indicated a severe right brachial plexus injury related to birth trauma.
|7Pue to a lack of useful arm function, he recommended that the child undergo surgery[3] in an attempt to repair the injury. On August 17, 1999, the child underwent surgery, which included grafting sites from the leg into the injured arm, however, “[essentially, there was no change.” A follow-up examination on July 8, 2002, revealed that the child continued to have very minimal use of his hand.
It was Dr. Tiel’s opinion that the injury suffered by the child was commonly associated with a shoulder dystocia condition at birth, which resulted from the stretching of the nerve. In addition, as to future treatment, it was his professional opinion that perhaps there are some things that could be done to improve the arm’s function (i.e., tendon transfers and fusion of the wrist or the use of a wrist brace). However, it was Dr. Tiel’s opinion that after five (5) years with little or no improvement in the condition of the arm, the likelihood of significant improvement is essentially close to nil.
Dr. James O’Leary was also called as an expert witness for the plaintiffs. He was accepted as an expert in the field of obstetrics. During his testimony, he concluded that the child’s injuries were not intrauterine and he eliminated, as' a potential cause, any natural forces iiivolved in labor. The forces in labor, according to'Dr. O’Leary, “come from the top and delivery is very much like squeezing toothpaste out of a tube.” He also testified that until the baby reaches the pubic bone, there is nothing for a baby’s shoulder" to get stuck behind.
| sDr. O’Leary opined that the brachial plexus and shoulder dystocia injuries have been historically linked for 200 years. He indicated that historic obstetric teachings have stated that brachial plexus injuries result from excessive traction and flexion exerted on the infant’s neck during delivery, thereby avulsing the cervical nerve root from the spinal cord. He explained that the impacted shoulder is in a fixed *952 position. If one pulls on the- head, the shoulder and neck will be stretched, which in turn stretches the brachial plexus nerves.
He also disagreed with an affidavit executed by Dr. Shoebieri, which indicated that the child’s position was “ROA” (right occiput anterior). Dr. O’Leary’s opinion was that the infant’s position was “LOA” (left occiput anterior) because of Dr. Shoe-bieri’s testimony that he placed his right hand in the birth canal during delivery to release the impacted shoulder.[4] Dr. O’Leary’s professional opinion was that if the infant’s position was indeed “ROA,” which Dr. O’Leary seriously doubted, Drs. Javate and Shoebieri would have had to pull upwards in order to injure the right shoulder.
However, if the position was “LOA,” the right shoulder would be anterior (top) and a downward pulling would injure the right shoulder. This is the positioning, Dr. O’Leary opined, that would most likely have caused an injury, such as the injury suffered by Shawn Jr.
Dr. O’Leary also testified that under no circumstances should one apply traction to the infant’s head while a child’s shoulders are impacted. He explained 19that had the delivery team pulled straight-out while both shoulders were stuck, then both shoulders would be at risk for injuries. The doctor concluded that it was below the standard of care to not have cut an episio-tomy under these circumstances, and it was further below the standard of care to ask the mother to push while the child’s shoulders were impacted. It was his professional opinion that the injury was caused by the excessive force applied to the child’s head, in the face of a shoulder dystocia diagnosis.
As to the amount of force required to cause such an injury, Dr. O’Leary could only estimate that in order to pull the C-5 nerve root from the spinal cord, “a very, very, very, strong force” would be needed. He concluded that it would be very rare for an infant to suffer brachial plexus injury of this magnitude in a shoulder dystocia situation without excessive force being applied to his head, and under these circumstances, a breach of the standard of care is almost always present.
At the close of the plaintiffs’ case in chief, the defendants moved for an involuntary dismissal, but the motion was denied. The district court held that sufficient evidence was presented by the plaintiffs to prove their prima facie case. The court specifically noted the credibility of the plaintiffs testimony in describing the actions of the delivery personnel.
After their motion was denied, the defendants presented their case. Dr. Javate testified that once he delivered the infant’s head, he had difficulty delivering the anterior (left) shoulder. Dr. Javate diagnosed shoulder dystocia and attempted to deliver the left shoulder by applying gentle downward traction, particularly the Jj^McRobert’s maneuver[5], and suprapubic pressure, but was unsuccessful in dislodging the impacted shoulder. Drs. Shoebieri *953 and Meadors were then called into the delivery room to assist. Dr. Shoebieri, who was the most senior resident, took over the delivery and successfully dislodged the infant’s shoulder.
Dr. Meadors, who was a second year resident at the time, testified that she supervised Dr. Javate during the initial part of the delivery. Dr. Meadors testified that she principally filled out paperwork, while Dr. Shoebieri delivered the child. She had no independent recollection of the delivery other than what the medical charts reflected on the date of birth. Dr. Meadors was subsequently dismissed from this suit, with prejudice, by the plaintiffs.
Dr. Shoebieri testified that he had experienced four or six severe shoulder dysto-cia births prior to the child’s delivery. Due to the urgency of the situation, Dr. Shoebieri only had time to put on gloves upon arrival in the delivery room. He testified that he then applied the McRo-bert’s maneuver and suprapubic pressure, but the procedures failed to free the impacted shoulder. He testified that due to the limited space in the birth canal, he inserted two fingers and was able to slightly rotate the baby counter-clockwise, then clockwise, and with the mother pushing, was able to successfully free the impacted shoulder. He testified that he indicated that the baby had a body dystocia in the medical notes. He also testified that he never applied any upward traction.
Nurse Boudreaux testified that she vaguely recalled the specific delivery maneuvers that were performed. She also indicated that she did not remember any difficulty in the delivery although the delivery itself was not a “spontaneous” one.
l^The three members of the medical review panel, who were all accepted by the district court as experts in Obstetrics and Gynecology, testified on behalf of the defendants at the trial. Each of the panel members testified that in their professional opinion, the medical team did not breach the standard of care during the delivery procedure.
Dr. Culotta testified that there was no mechanism to account for the child’s injuries because there was no rigid point for the right shoulder to become stuck behind to stretch the neck.
Dr. Winfield testified that he had prior experience with shoulder dystocia. In the present case, his opinion was that the mechanism for the child’s injury was the tremendous forces exerted by the uterus during labor. He was certain that it was not the fault of the physicians at the delivery. He also testified that in his professional opinion, the nurse’s notes were reliable and could be counted upon for accurately reporting the events that occurred during delivery.
Dr. Stephens testified that he had experience in treating brachial plexus injuries and shoulder dystocia. He also explained that when a shoulder dystocia in the ROA (right occiput anterior) position occurs, the left shoulder would be stuck, and to relieve it, gentle traction downward, not upward, would be applied.
After the defendants presented their case, the district court rendered judgment in the defendant’s favor and dismissed the plaintiffs’ suit, with prejudice. The district court concluded:
This was a very difficult case for the Court, very difficult because circumstantially I think the problem is that I don’t think the evidence supports any award of damages to the plaintiff. However, because of the circumstances I just don’t know what happened, and I don’t think anybody really knows what happened, but legally I am bound to consider the evidence and the law, and the 112evidence and the law force me to zero the plain *954 tiffs’ and to dismiss their case against the State, [emphasis added]
In response, the appellants filed this appeal.
Discussion
In their first assignment of error, the appellants argue that the district court erred in concluding that the plaintiffs failed to carry their burden of proof that the stretching of Shawn Jr.’s brachical plexus nerve was a result of the defendants’ application of excessive force during delivery.
This court in Mendoza v. Leon’s Plumbing Co., 2004-0189, (La.App. 4 Cir. 12/22/04), 892 So.2d 600, discussed the standard of review for appellate courts which establishes that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” In our opinion, we held:
In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Freeman, 93-1530 at p. 5, 630 So.2d at 737-38; Stobart v. State, Dept. of Transportation and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Where there are two permissible views of the evidence, a factfinder’s choice between them can never be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882. Thus, if the factfinder’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La. 1990). Banks v. Industrial Roofing Sheet Metal Works, Inc., 96-2840, p. 8 (La.7/1/97), 696 So.2d 551, 556.
Mendoza at 603. Thus, the reviewing court must do more than simply review a record for some evidence which supports the trial court’s finding; it must deteimine liathat the record, as a whole, establishes the trial court was justified in its conclusions.
With respect to medical malpractice claims, our law provides that the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La. R.S. 9:2794(A). Thus, in order to prevail in a medical malpractice claim, the plaintiffs must prove: the applicable standard of care, a breach of that standard, *955 and injuries caused as a result of breaching the standard of care.
The medical testimony given in this case relies heavily upon Williams Obstetrics[6]. Williams Obstetrics is a medical textbook that outlines the entire specialty of obstetrics and is meant to be the definitive textbook in the field. Each of the doctors who testified in this matter is familiar with Williams Obstetrics, 114and admitted as much in their testimony. However, our review of the court record revealed expert testimony which contradicted widely held teachings found in Williams Obstetrics.
The Williams manual recommends several procedures to dislodge impacted shoulders during delivery which include: the McRobert’s maneuver; suprapubic pressure, an episiotomy, and the Woods “corkscrew” maneuver, which is performed using both hands to rotate the child. However, traction should not be applied to an infant’s head while his shoulders are impacted.
Our extensive review of the record revealed a number of discrepancies and contradictions which require a close examination of the testimony given in this case. First, the medical notes from the delivery are inconsistent. Dr. Shoebieri, Dr. Ja-vate, and Nurse Boudreaux each took notes of the birthing procedure. However, the testimony reflects that each of them had varying accounts of what actually happened during the delivery.

Nurse Boudreaux:

Nurse Boudreaux’s testimony illustrates, for the most part, that the record-keeping procedures in the delivery room were discrepant. It was her duty to take notes to have a written record of events. However, in some instances, her medical notes reflected procedures which may have not taken place (the episiotomy), while they under-reported, or displayed a disparaging lack thereof, of more serious developments during the childbirth procedure (the dysto-cia) which required the intervention of a more senior doctor.
j1sThe notes also reflect the presence of delivery personnel who were not present during the procedure. , Although Nurse Boudreaux indicated that Dr. Kot was the attending physician in her delivery notes, she admitted, during trial, that Dr. Kot was not physically present in the delivery room, even though she listed Dr. Kot as a member of the delivery personnel.
Q: You said in this note that the attending physician was Dr. Kot?
A: That would have been the staff physician.
Q: He was present?
A: Dr. Kot, I don’t recall, I have it on there.
Q: Let me ask you: If you put on this form that this physician was there, you wouldn’t make it up would you?
A: No. That was the listing of who’s actually in-house.
Q: But doesn’t this form say, “delivery personnel”?
A: Uh-huh.
Q: So, you wouldn’t put an in-house physician here if he wasn’t on the delivery personnel team?
A: No.
Q: So, Dr. Kot would have had to have been there?
A: I can’t recall him being there.
In another line of questioning, the following colloquy took place:
Q: Now, you said you were the one that called Dr. Shoebieri?
*956 A: Yes.
Q: Who told you to call him?
A: I can’t recall. We had a lot of deliveries. Either I initiated it, someone told me to call; that’s how it usually worked.
|1(iQ: And what did that person tell you the reasons why he or she wanted you to call Dr. Shoebieri?
A: It would have been shoulder dysto-cia in this case.
Q: Is there any reason why that you know of Dr. Javate could not have taken care of the problem?
A: From what I see, he was a first-year. He could take care of it. The experience behind it — that’s just how it worked in deliveries— when we had complications, we would call the second or the third or fourth.
Q: Why wouldn’t you chart what actually took place in the delivery?
A: Like who I called, when I called them?
Q: Like anything the doctors may have done in delivering the baby.
A: I would usually chart if there was forceps or like — For what instance?
I don’t understand.
Q: But in this case you didn’t chart any thing about shoulder dystocia or the problems they were having in delivering the shoulder?
A: At 12:20, “Vaginal delivery of male child. Shoulder dystocia.”
Q: But you only marked shoulder dys-tocia.
A: Uh-huh.
In the last and most noteworthy testimony, Nurse Boudreaux was questioned about what procedures she observed Dr. Javate perform during the delivery.
What made this delivery complicated? <y
To my knowledge, it was a shoulder dystocia. >
And were you present when the shoulder dystocia was first diagnosed? O’
Yes. V
Who diagnosed it? O’
Dr. Javate. <I
And then what did you notice him do after he diagnosed shoulder dystocia? k <©
After he diagnosed shoulder dysto-cia, he proceeded to deliver. And then he called Dr. Shobieri to come in.
Why was Dr. Shoebieri called? <©
Because there was a difficulty in the delivery. ¡>
Dr. Javate could not get the shoulder delivered? O’
Correct.
[[Image here]]
Q: And you watched him when he was trying to free the impacted shoulder?
A: Yes.
Q: And you never saw him apply any traction to the head of the baby?
A: Well, he — I don’t know if you’re calling traction pulling.
Q: Pulling on the baby’s head to try to get the shoulder delivered.
A: Yes.
Q: You saw [Dr. Javate] do that?
A: Yes.
Nurse Boudreaux also indicated that a midline episiotomy was performed on Ms. Salvant in her testimony under oath.
Q: Did you mark on here that a mid-line episiotomy was performed?
*957 A: Yes.
Q: Did you observe that?
A: Yes. ■
Q: Did you also observe the repair of the episiotomy?
A: Yes.
|1sThe above testimony is inconsistent with the testimony given by Drs. Shoebieri and Meadors. When deposed prior to trial, Dr. Shoebieri never mentioned an epi-siotomy, but later, he submitted a sworn affidavit that he extended one. However, at trial, Dr. Shoebieri testified that he attempted to extend an episiotomy, but he stated that he could not because the perineum was stretched too thin and there was not enough space to perform the procedure. Dr. Meadors’ delivery notes, on the other hand, indicate that no episiotomy was performed or repaired per the trial transcript. Dr. Javate testified that he did not see an episiotomy performed. However, Nurse Boudreaux continued to maintain that her charting was accurate.
Q: Does the delivery notes say if an episiotomy was performed?
A: No. It says no.
Q: Dr. Jones says no episiotomy was performed and Dr. Jones says no repair of an episiotomy was undertaken. Is it still your testimony that you saw an episiotomy?
A: I’m going according to my charting. Yes.
Q: And you got this information from visibly seeing them do an episioto-my?
A: Uh-huh.
Q: With Dr. Jones in the room with you?
A: Yes. Her name is on the chart.
Based on the above testimony, it is evident that although Nurse Boudreaux was present in the room, her charting of the birthing procedure may not be reflective of what actually happened.
Second, our review of the testimony also confirms that while Drs. Shoebieri and Ja-vate were both directly responsible for the delivery at different times, each h agave varying accounts as to what procedures they actually employed during the delivery.

Dr. Shoebieri’s Testimony

Although we have already discussed Dr. Shoebieri’s testimony with respect to his extending an episiotomy, Dr. Shoebieri also gave conflicting testimony concerning the actual procedures he performed to release the child’s shoulders. Dr. Shoebi-eri’s delivery summary indicated that he performed a Wood’s corkscrew maneuver. However, during trial, he testified that what he actually performed was a “Rubin” maneuver, or a reverse Woods corkscrew maneuver. The record describes the Rubin maneuver as, first, applying traction to the mother’s abdomen in an effort to release the child’s impacted shoulders. If the first procedure is not successful, the second recommended procedure is to reach the hand into the mother’s birth canal, grabbing the infant’s most accessible shoulder, and pushing the shoulder toward the child’s chest to release the shoulders.
However, based upon his own testimony, Dr. Shoebieri described the procedure he performed as follows:
I could stick about maybe two fingers behind the baby’s back with my left hand. And it rotated, very slightly counterclockwise. I did feel a little give without the mother pushing where I felt like maybe it was disimpacted, but really physically it was impossible for me to use my left hand anymore. So, I used my right hand.
And at this point, again, testing which way it would go, I rotated it clockwise. And then the baby — [t]hen I asked the *958 mother to push at the same time. And I knew the shoulder was disimpacted and I felt like — [i]t didn’t take long. And I felt like it was an easy maneuver despite the lack of space.
lanBut what I was most impressed by at that .point was that she was pushing and the baby wasn’t coming out. [emphasis added]
In fact, Dr. Shobieri testified that what he did was “probably .analogous” to a Rubin maneuver. However, the procedure he described is not a Woods maneuver, nor was it a Rubin maneuver.
■ Dr. Shoebieri then testified that he applied traction either at a “straight-out” or at a “45-degree angle,” rather than apply gentle downward traction as Williams Obstetrics recommends. Dr. Shoebieri testified to such matters even though he had testified earlier that “any undue traction on a baby’s head while the shoulders are impacted could cause injury.” Thus, he understood what the proper standard of care would be under the circumstances, but still inappropriately applied “straight out,” and perhaps upward traction at a 45-degree angle knowing that the child’s shoulders were impacted. Furthermore, Dr. Shoebieri never mentioned the fact that enough force was applied during the delivery to fracture the middle one-third of the child’s clavicle.

Dr. Javate’s testimony ■

When questioned about what procedures he did, Dr. Javate testified that he did not apply traction while the child’s shoulders were impacted. However, we have the testimony of Mrs. Wanda Lewis and Ms. Salvant who both testified that they saw Dr. Javate “pulling” on the child’s head. In addition, if we are to consider Nurse Boudreaux’s testimony about what she observed, independent of her charting, she also testified that she saw Dr. Javate “pulling” on the infant’s head. This testimony becomes more compelling given that we have at least two credible witnesses who claim to have heard someone, presumably Dr. Shobieri, enter the room and yell “stop” to Dr. Javate prior to taking over the delivery.
1Dr. Javate, as a first year resident, should have been familiar with the procedures to successfully manage impacted shoulders. However, when he was questioned about what happened immediately prior to Dr. Shobieri’s intervention in the delivery room, he could not remember what he instx-ucted Ms. Salvant to do, that is, he had told her to stop pushing once he diagnosed the shoulder dystocia. Dr. Ja-vate’s deposition, which was taken on July 20, 2000, contained the following colloquy:
Q: Do you recall, Dr. Javate, if whether Or not after you had diagnosed the shoulder dystocia problem whether or not the mother was still pushing?
A: I do not recall whether the mother was still pushing, but the mother should not have been pushing at that time.
Q: Why is that?
A: Generally, from my understanding, pushing with a dystocia would cause more of a stretching type of injury.
Dr. Javate would only conclude that if Ms. Salvant continued to push after he diagnosed the dystocia, then the pushing was not done at his insistence. However, as the doctor in charge, this exchange indicates that he could not have managed the situation properly due to his inexperience. Dr. Javate’s lack of experience is evident because something had clearly gone awry with the delivery which made it necessary for Dr. Shoebieri to take charge of the delivery so suddenly, that is, without donning proper medical scrubs.
*959 Taking the unique circumstances of this case under consideration, we have several accounts of varying procedures performed or documented as having occurred during the delivery. Additionally, we have a dispute as to the child’s position in the birth canal at the time the procedures to release the child’s shoulders were undertaken. Also, we have medical notes taken by Nurse Boudreaux which were done contemporaneously with the delivery. However, taking into account the ^conflicting accounts by other staff, the delivery notes are unreliable. It is understood that “where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.” Williams v. Louisiana Medical Mut. Ins. Co., 2003-1081 (La.App. 4 Cir. 1/14/04), 866 So.2d 306, 310, citing Rosell v. ESCO, 649 So.2d 840 at 844-45 (La.1989).
 Finally, we have the medical review panel testimony which fails to shed any light on the possible causes of the child’s injury, other than to attribute the cause of the injury to unknown intrauterine forces. However, the weight to be given expert testimony is dependent upon the facts on which it is based as well as the professional qualifications and experience of the expert. If the opinion is based upon facts not supported by the record, the opinion may be rejected. Meany v. Meany, 94-0251, 639 So.2d 229, 236 (La.7/5/94) citing Thomas v. Petrolane Gas Service Ltd. Partnership 588 So.2d 711, 719 (La.App. 2d Cir.1991). Our review of the record indicates that the medical review panel’s finding that the injury was caused by an extensive unknown intrauterine force is not supported by the record or the medical reports.
Conversely, we have the plaintiffs’ testimony which consists of Mrs. Wanda Lewis’ undisputed trial testimony, Ms. Salvant’s testimony, and Dr. O’Leary’s expert testimony in which he testified that he had never seen a brachial plexus injury of this magnitude without a shoulder dystocia injury.
Thus, while we may have two conflicting views of the possible causes of the injury, Dr. O’Leary’s opinions are consistent with the widely held practices of the 12Rprofession as outlined in Williams Obstetrics, and his testimony refers to the textbook, thus evidencing a close familiarity with the shoulder dystocia management procedures. Per the record, Dr. O’Leary’s articles are also quoted in the textbook as an authority on shoulder dystocia, and he has also lectured hundreds of times on the topic. Based on his testimony, it is evident that Dr. O’Leary’s experience with shoulder dystocia injuries and the recommended maneuvers to free impacted shoulders, are those widely accepted within the profession to handle difficult births. Thus, our review of the record indicates that the plaintiffs’ testimony and expert witnesses are more credible than the defendants.’
We find this assignment of error has merit and conclude that the district court was manifestly erroneous or clearly wrong in concluding that the plaintiffs did not meet their burden of proof. Our review of the record supports our conclusion that the stretching of the child’s brachial plexus nerve, and subsequent avulsion of the nerve roots, was caused by pulling of the child’s head while his shoulders were impacted. Therefore, we reverse the district court’s judgment which dismissed the Appellants’ case with prejudice.

*960
Res Ipsa Loquitar

In their second assignment of error, the appellants argue that the district court erred in not applying the doctrine of “res ipsa loquitar” despite undisputed evidence that the stretching of the brachial plexus nerve does not occur without excessive force. In Montgomery v. Opelousas General Hospital, et al, 540 So.2d 312 (La.3/13/89), the Supreme Court discussed the doctrine of res ipsa loquitar as follows:
| ¡>4The principle of res ipsa loquitur is a rule of circumstantial evidence that infers negligence on the part of defendants because the facts of the case indicate that the negligence of the defendant is the probable cause of the accident, in the absence of other equally probable explanations offered by credible witnesses. Boudreaux v. American Insurance Co., 262 La. 721, 763-64, 264 So.2d 621, 636 (1972). The doctrine allows an inference of negligence to arise from the common experience of the factfinder that such accidents normally do not occur in the absence of negligence. Additionally, the doctrine does not dispense with the rule that negligence must be proved. It simply gives the plaintiff the right to place on the scales, “along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence” sufficient to shift the burden of proof. Id.; Larkin v. State Farm Mutual Automobile Insurance Co., 233 La. 544, 551, 97 So.2d 389, 391 (1957).
The doctrine applies only when the facts of the controversy “suggest negligence of the defendant, rather than some other factor, as the most plausible explanation of the accident. Application of the principle is defeated if an inference that the accident was due to a cause other than defendant’s negligence could be drawn as reasonably as one that it was due to his negligence.” Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1048 (La. 1979); Boudreaux v. American Insurance Co., 262 La. 721, 765, 264 So.2d 621, 636 (1972). The doctrine does not apply if direct evidence sufficiently explains the injury. Walker v. Union Oil Mill, Inc., supra at 1048; King v. King, 253 La. 270, 278, 217 So.2d 395, 395 (1968).
Id. at 319.
There is no dispute among the parties in this case that the injury to Shawn, Jr.’s arm most likely occurred during the child’s delivery. The medical testimony conflicts, however, as to whether the injury occurred in the absence of negligence. Dr. Javate testified unequivocally that he properly attempted to deliver the child and when it became apparent that he could not, a senior medical staff member was called to complete the delivery.
LsThe doctors also differ in their opinions concerning whether brachial plexus injury was the result of unknown intrauterine forces (based upon the medical review panel’s opinion), or excessive outside forces which were applied to the child’s head during the delivery procedure.
In support of their contention that the causes of the child’s injury was not caused by the doctor’s negligence, the defendants sought to prove that brachial plexus injuries occur without a shoulder dystocia diagnosis by introducing a study by Dr. Robert Gherman, concerning brachial plexus injuries.
The Gherman article, which appeared in the American College of Obstetrics and Gynecology (the “ACOG”) bulletin,[7] basi *961 cally stood by the conclusion that 50% of all brachial plexus injuries occur without shoulder dystocia. These results were compiled based upon a computerized review of all hospital discharge summaries between 1991 and 1995, and concluded that 34 to 47% of all brachial plexus injuries occur routinely without a shoulder dystocia diagnosis by the medical staff.
However, as pointed out by Dr. O’Leary during his testimony, the findings of Dr. Gherman’s study are misleading. The reason for this assertion is due to the fact that if an infant is diagnosed as having a shoulder dystocia complication during the delivery procedure, and the diagnosis is not documented in the medical chart, but the child suffers a brachial plexus injury which is documented in the medical chart, then the conclusion may be incorrectly drawn that the shoulder dystocia had nothing to do with the brachial plexus injury.
[ gfiThe record indicates that in the article, Dr. Gherman himself even admitted that the study had an inherent ascertainment bias because the “no shoulder dysto-cia” designation in some of the medial records considered, may actually represent non-recognition of the shoulder dystocia condition or better yet, incomplete documentation by the medical staff who prepared the medical notes.
We are apt to say that the panel members’ disposition is broadly conclusive and speculative at best. The panel’s decision is unsuccessful at explaining the proximate cause of the infant’s injury, but is nonetheless clear in substantially exonerating the delivery team of possible fault. Thus, the panel decision is not credible because it merely offers conclusions, and does not explain the obvious question: if the doctor’s negligence was not the sole and proximate cause of the injury, then what identifiable and known intrauterine mechanism or force caused the injury? The medical review panel did not venture to offer any rational explanation to this question, but instead concluded that it was. not their purpose to attribute causation.
Based upon the record before us, we know that there are several procedures which are widely recognized as the proper procedures to resolve or manage shoulder dystocia problems when they occur. These' procedures include: suprapubic pressure, the McRoberts maneuver, the Woods corkscrew maneuver, and perhaps the Rubin procedure.[8] However, while the McRobert’s maneuver, suprapubic pressure, and an episiotomy are the least invasive and require no physical maneuvering of the child, the Woods maneuver and the Rubin procedure require the manual and physical repositioning of the infant. Therefore, it is | ^reasonable to find that a child may be injured as a result of employing the latter two procedures. Thus, our inquiry becomes whether it is more probable than not that the injury was caused by the negligence of the physicians, rather than a phantom intrauterine mechanism.
As we have earlier determined, our extensive review of the record before us indicates that the plaintiffs’ testimony is more convincing than that of the defense witnesses. The record is clear that the defense witnesses are factually inconsistent about what transpired in the delivery room. At least three professionals on the delivery team who were all in the vicinity of the birth, each testified that they completed medical charts to document the events on that occasion, but their records vary and their testimony becomes unreliable because of the inconsistent charts and accounts.
*962 However, in light of the inconsistencies in the defense testimony, we are expected to give greater credibility to the defendants’ testimony because the medical review panel determined that it was “more likely than not” that the delivery team was not negligent in causing the infant’s injury, without any factual support to justify their conclusion. We therefore find that the medical review panel’s conclusions in this matter are also unreliable.
Ms. Salvant was under the direct care and control of the defendants during the entire time of her labor. She was not in a position to challenge their management of the birthing procedure and she had no reason to suspect that pushing, as she was so instructed, would injure her child. Quite simply, Dr. Javate was inexperienced in managing the shoulder dystocia problem. He attempted to deliver the child and we have testimony from him which indicates that he made at least one unsuccessful attempt to deliver the child prior to Dr. Shobieri’s entry into |2Sthe delivery room to assist. We also have at least two witnesses who observed Dr. Ja-vate pull on the infant’s head. These same witnesses also heard someone yell “stop” to Dr. Javate, presumably, to cease whatever it was he was engaged in at the time of Dr. Shoebieri’s entrance into the delivery room. Cléarly, if Dr. Javate had matters under his control, then there would not have been a reason to stop him so suddenly had he correctly employed the dystocia management procedures.
It is documented and undisputed that Ms. Salvant had a normal pregnancy, yet her child’s injury is one caused by excessive pulling of the neck during a birthing procedure. Although the panel concluded the proximate cause of the injury was intrauterine, they could not explain how intrauterine forces could apply excessive force to the neck when the child’s head was already delivered — clearly outside of the birth canal — -within the grasp of the staff doctors responsible for the delivery.
Dr. Javate’s inexperience in managing a shoulder dystocia birth during his first month of his medical residency made it necessary for Dr. Shoebieri to intervene. For the above reasons, we conclude that the brachial plexus injury was more likely than not caused by improper management of the shoulder dystocia diagnosis. Further considering the testimony and evidence presented in this case, we find that the district court erred in not applying the doctrine of “res ipsa loquitar.”
DAMAGES
In Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), the Court discussed the standard of review of general damage awards, as follows:
|29The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from the jurisprudence is that the discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id. at 1261.
In the case at bar, the Appellants argue that the district court abused its discretion in not awarding any monetary damages to the plaintiffs for the child’s injuries. The *963 record indicates that the child has suffered a permanent disabling injury to his brachial plexus nerves which renders his arm useless and significantly limits his activities. The record also indicates that the child underwent surgery less than a year after his birth in 1998, in an attempt to reverse the effects of the injuries through nerve grafts, but to no avail. The surgeon, Dr. Tiel, testified that this surgery did not improve the condition of the child’s damaged arm.
However, despite the fact that the district court reviewed the testimony and. evidence, and despite an earlier denial of the defendants’ Motion for Summary Judgment in which the district court indicated that the plaintiffs met burden in presenting a prima facie case of negligence, the district court still would not find that any of the defendants were negligent. Hence, the district court did not award any damages to the plaintiffs. In its oral reasons for judgment, the district court opined:
Ma’am, I hope, and sir, you all have a beautiful little boy. The fact that he has a problem with one of his arms 13nshould not prevent him from being able to live a productive life. You need to search out — I know many people who have the use of one limb, be it leg or arm, or even people who have been blind from birth, but who have been able to overcome those handicaps or those limitations at least, and there is no reason for you not to be able to search out those kind[s] of things for your child... [h]e can adapt to the use of one arm. He may need some vigorous kinds of alternative training and alternative therapy, but there is no reason why you should not be able to seek that out for him. I mean, you see stories of people who have succeeded despite no arms or no legs, so I don’t think there is any reason why your — I was touched by you son. I am being honest with you...
... I took an oath of office and that oath of office means that I listen to cases and I listen to the facts, and I believe everything you said, Ma’am. I believe everything you said, sir. The problem is there was simply no evidence to support an award in favor of your son, in favor of you.
However, we find that the district court committed manifest error. In spite of-the fact that Shawn Lewis, Jr. is a young boy who has a wealth of years before him and that he may be able to lead a productive life with only one arm does not mitigate the fact that the child’s injuries occurred during a routine birth delivery while under the supervision and direction of at least two doctors, one of whom was observed pulling on the child’s head by an attending nurse.
The child’s injury, what can best be described as a severe and irreparable nerve avulsion, has had á serious impact on the child’s ability to participate in recreational activities that other normal six (6) year old boys his age would engage. Additionally, the child’s parents testified that he cannot bathe, dress, or tie his own shoes without assistance. The child’s surgeon, Dr. Tiel, opined that after five years with little or no progress, the chances for marked improvement of the damaged arm are, even with tendon transfers, essentially close to nil. Therefore, we find that the district court committed manifest error in not awarding damages for the |s1injury suffered by the child. Consistent with Youn, supra, we conclude thabthe district court’s refusal to award damages to the Appellants is “beyond, that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances.” We therefore reverse the dis *964 trict court judgment and- award damages at the statutory maximum.
DECREE
For the above and assigned reasons, we reverse the district court’s judgment which dismissed the Appellants’ case with prejudice and find that the defendants were negligent in their general conduct which fell below the standard of medical care, and under the theory of Res Ipsa Loqui-tar. We also reverse the district court judgment and award the maximum statutory damages allowable for medical malpractice.
REVERSED AND RENDERED.
ARMSTRONG, C.J., dissents.
MURRAY, J., dissents and assigns reasons.

. Dr. Bernadette Jones Meadors is referred to as both “Dr. Jones” and "Dr. Meadors” in the record.

. The testimony had several accounts as to how Drs. Shoebieri and Meadors made their way to the delivery room. However, Nurse Boudreaux testified that she probably called . them into the room, even though Dr. Javate testified that he did not recall if he asked Nurse Boudreaux to call for- assistance.

. The active title of the type of surgery performed was not indicated in the record.

. These acronyms, "ROA” and "LOA,” refer to the positioning of the child’s head once it has been delivered and the shoulders remain in the birth canal. A child’s position is "ROA” (right occiput anterior) when his head faces the mother’s left thigh with the right shoulder being in the anterior or top position, while "LOA” (left occiput anterior) position points the child’s head facing the mother’s right thigh. In this position, the left shoulder is in the anterior position.

. The McRobert’s maneuver requires that the mother flex her legs to her chest in order to assist with the delivery process. The doctor manually maneuvers the infant to dislodge ‘the child.

. The record indicates that Williams Obstetrics, 20th- Edition was extensively referenced during trial. Illustrations and diagrams were also used from this text.

. The ACOG is a medical journal. The Gher-man article is titled “Brachial Plexus Palsy, An In Utero Injury.” The record does not indicate the specific publication date.

. Although Dr. Shoebieri testified that he performed this procedure, the description he gave during testimony is not a Rubin maneuver. .