935 So.2d 646 (2006)
Christy SALVANT, Individually, And as Natural Tutrix of her Minor Son, Shawn Lewis, Jr. and Shawn Lewis, Sr.
v.
STATE of Louisiana, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, Louisiana State University Medical Center at New Orleans, Medical Center of Louisiana at New Orleans, et al.
No. 2005-C-2126.
Supreme Court of Louisiana.
July 6, 2006.
Rehearing Denied September 1, 2006.
*648 Charles C. Foti, Jr., Attorney General, Vezina & Gattuso, Joseph M. Vezina, Andrea C. Caplan, Kelli M. Khalaf, Special Assistant Attorneys General, for Applicant.
Mendoza & Hardin, Al J. Mendoza, Harvey, for Respondent.
Nicholas Gachassin, III, Lafayette, Julie A. Savoy, Counsel for Louisiana State Medical Society and Louisiana Medical Mutual Insurance Company, Amicus Curiae.
VICTORY, J.
We granted a writ application in this medical malpractice case to determine whether the court of appeal correctly applied the appropriate standard of review in reversing a trial court judgment in favor of the defendants. After reviewing the record and the applicable law, we reverse the judgment of the court of appeal and reinstate the trial court judgment.

FACTS AND PROCEDURAL HISTORY
On July 31, 1998, Christy Salvant was admitted to the Medical Center of Louisiana for delivery of her baby after her membranes ruptured.[1] After she was fully dilated, she was instructed to push, and labor progressed normally until after the head of the baby was delivered. The medical records indicate that the baby's position was ROA, or right occiput anterior, which means the left fetal shoulder was on top with the baby's head facing the maternal left thigh. Dr. Emanuel Javate, the first year resident handling the delivery, testified that after applying gentle downward traction on the head and having trouble delivering the shoulders, he diagnosed shoulder dystocia. Shoulder dystocia is most often defined as a delivery that requires additional obstetric maneuvers following failure of gentle downward traction on the fetal head to effect delivery of the shoulders. Shoulder dystocia is caused by the impaction of the anterior fetal shoulder behind the maternal pubis symphysis. It also can occur from impaction of the posterior fetal shoulder on the sacral promontory. Shoulder dystocia is an obstetrical emergency because the baby needs to be delivered within minutes, as he is unable to breathe on his own or via the umbilical cord due to the compression and the forces of labor.
In this case, Dr. Javate testified that the impaction was of the anterior fetal shoulder behind the maternal pubic bone. Dr. Javate testified that he applied the McRoberts maneuver, in which the mother's legs are flexed to her chest, in order to widen the pelvis, while applying gentle downward traction, and suprapubic pressure, in which pressure is applied to the area of the pubic bone, in order to dislodge the anterior shoulder. When these maneuvers failed, *649 Dr. Seyed Abbas Shoebeiri, the senior fourth year resident, and Dr. Bernadette Meador Jones, another resident, who were standing right outside the door, were called into the room.[2] Dr. Shoebeiri immediately took over the delivery from Dr. Javate and, after several maneuvers described later in this opinion, the baby was delivered within seconds.
After the baby was delivered, the baby's right arm was limp. He was later diagnosed with a brachial plexus[3] injury, in which the C-5 nerve root was pulled from his spinal cord. Brachial plexus injuries are sometimes identified by different names and can occur to varying degrees.[4] The evidence at trial indicated that a brachial plexus injury can result from a stretching or tearing of the upper roots of the brachial plexus which is readily subjected to extreme tension as a result of pulling laterally upon the head, thus sharply flexing it towards one of the shoulders. Dr. Stephen Deputy, a child neurologist at Children's Hospital in New Orleans who began seeing Shawn Jr. On December 17, 1998, testified that the "overwhelming majority" of brachial plexus injuries are due to trauma induced during delivery, with the trauma being caused by the head separating from the shoulder and stretching the nerve roots. Dr. Robert Tiel, a neurosurgeon at LSU School of Medicine who first saw Shawn Jr. when he was ten months old, testified that in his opinion the injury suffered by the baby was a brachial plexus injury related to birth trauma. Dr. Tiel recommended that the child undergo surgery in an attempt to repair the injury, but after surgery on August 17, 1999, the child continued to have very minimal use of his hand. At the time of trial, there was no improvement and the injury is considered permanent.
The plaintiffs, Shaun Lewis Jr.'s mother and father, filed suit against the State of Louisiana, LSU Health Sciences Center, University Hospital Campus, and Drs. Shobeiri, Meadors Jones,[5] and Javate. Their petition alleges that during delivery, "pulling" of the baby's head, with excessive force, resulted in permanent damage to his right arm. A Medical Review Panel was convened on February 1, 2002, and after considering the evidence that had been submitted, returned a unanimous opinion in favor of defendants. The Medical Review Panel gave the following reasons for its opinion:
1. The child was right occiput anterior (ROA) in his presentation.
2. The left shoulder would be impacted and the injury would be to the left arm. This baby suffers from Erb's Palsy on the right.
3. The baby's injury occurred prior to his birth and the delivery team most likely had nothing to do with it.
4. Erb's palsy can occur in infants delivered by cesarean section and is a result *650 of a yet unknown intrauterine mechanism.
As a result of the panel findings, this suit was instituted on February 28, 2001. After a three-day bench trial, the trial judge ruled from the bench in open court, as follows:
This was a difficult case for the Court, very difficult because circumstantially I think the problem is that I don't think the evidence supports any award of damages to the plaintiff. However, because of the circumstances I just don't know what happened, and I don't think anybody really knows what happened, but legally I am bound to consider the evidence and the law, and the evidence and the law force me to zero the plaintiffs' and to dismiss their case against the State.
. . .
. . . The problem is there was simply no evidence to support an award in favor of your son, in favor of [plaintiff].
The plaintiffs appealed, and the Fourth Circuit reversed the trial court's judgment in a three-to-two decision, finding that the brachial plexus injury was more likely than not caused by improper management of the shoulder dystocia diagnosis, and, that the district court erred in not applying the doctrine of res ipsa loquitur. Salvant v. State, Bd. of Supervisors of Louisiana State University, 04-CA-0805 (La.App. 4 Cir. 6/01/05), 904 So.2d 946, 962. Further, the court of appeal awarded the plaintiffs the statutory maximum amount of damages. Id. at 963-64. We granted the defendants' writ application to determine whether the court of appeal correctly applied the appropriate standard of review in reversing the trial court judgment and, whether the court of appeal erred in applying the doctrine of res ipsa loquitur to the facts of this case. Salvant v. State, 05-2126 (La.3/10/06), 925 So.2d 492.

DISCUSSION
Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirely and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Id. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Id.; Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270, 278-79. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id. However, where documents or objective evidence so contradict the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Rosell, supra at 844-45. But where such factors are not present, and a fact finder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id.[6]
*651 In a medical malpractice case, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La. R.S. 9:2794(A).
Implicit in the trial court's judgment in favor of defendants is that plaintiffs did not prove that any of the defendants breached the applicable standard of care or that any breach of the standard of care by the defendants caused the injury. Thus, the issue is whether a reasonable factual basis exists in the record for either of these findings.
The standard of care in handling a case of shoulder dystocia was established by the documentary evidence and the medical testimony as follows. First, the McRoberts maneuver may be attempted, which involves "hyperflexion and abduction of the hips causing cephalad rotation of the symphysis pubis and flattening of the lumbar *652 lordosis that frees the impacted shoulder." Then, or at the same time, suprapubic pressure may be used to assist in dislodging the impacted shoulder. If those attempts fail, direct fetal manipulation, such as the Wood's corkscrew maneuver, wherein the physician inserts a hand into the birth canal and onto the baby's back and turns the baby to dislodge the shoulder, may be attempted. After that, there are more drastic measures that may be taken in order to prevent death of the baby.
Dr. Javate testified that while he was attempting to dislodge the shoulder using McRoberts and suprapubic pressure, he applied gentle downward traction to the baby's head. Likewise, Dr. Shobeiri testified that he applied gentle guidance traction while the mother was pushing after he conducted the Wood's corkscrew maneuver in which he placed his right hand on the baby's back and turned the baby's shoulder toward the mother's left thigh. However, he testified that it only took him less than a minute to deliver the baby. The baby's grandmother testified that after the head was delivered, "they started pulling on the baby head telling her to push when she  just pulling on the baby trying to get him out." Ms. Salvant testified that she pushed the entire delivery and that at some point another person entered the room shouting "stop."[7] Nurse Dawn Boudreaux, who was with Ms. Salvant during her labor and delivery, testified as to Dr. Javate's actions as follows:
Q. Dr. Javate could not get the shoulder delivered?
A. Correct.
Q. Did you watch him apply traction to the baby's head while he was trying to deliver the shoulder?
A. No.
Q. You never did see him apply any traction?
A. No.
Q. And you were watching him all the time?
A. Not all the time.
Q. But you were watching him when he delivered the head?
A. I was in the room, yes.
Q. And you watched him when he was trying to free the impacted shoulder?
A. Yes.
Q. And you never saw him apply any traction to the head of the baby?
A. Well, he  I don't know if you're calling traction pulling.
Q. Pulling on the baby's head to try and get the shoulder delivered.
A. Yes.
Q. You saw him do that?
A. Yes.
The medical evidence was consistent that gentle downward traction was appropriate when the McRoberts maneuver and suprapubic pressure were applied.[8] However, it was undisputed that simply pulling on a baby's head when the shoulders are impacted is below the standard of care because that could cause a brachial plexus injury.
A key issue in this case was the position of the baby when the shoulder dystocia was discovered. All the medical *653 personnel who actually witnessed the delivery testified that the baby was ROA, or, right occiput anterior. Contrary to what the court of appeal explained,[9] ROA means that the baby's head is facing the mother's left thigh and that, because the baby is coming out head first, the baby's left shoulder is on top. Nurse Boudreaux, who was an experienced labor and delivery nurse and was present during and after the delivery, produced a delivery summary note and narrative charting. The delivery summary was admitted into evidence as a joint exhibit and clearly notes that the baby's position was ROA. Further, Dr. Shobeiri's affidavit states that the baby's position was ROA. Dr. Javate testified that after the head was delivered, it was the anterior shoulder, or left shoulder, that was stuck. At no time did the plaintiffs provide any countervailing objective medical evidence indicating any other presentation.
In spite of this, the court of appeal found that the direct[10] medical evidence, particularly the delivery notes indicating the baby's presentation was ROA, was "unreliable," and that there was a "dispute" as the child's position in the birth canal. The court of appeal found the notes "unreliable" because they erroneously stated that an episiotomy was performed, and that Dr. Kot, staff physician, was the attending physician when in fact he was not actually present in the delivery room.
However, the ROA presentation on the delivery summary prepared by Nurse Boudreaux was entered into evidence jointly by the parties, was supported by the doctors who actually witnessed the birth, and the plaintiffs presented no conflicting direct evidence. The fact that there was a discrepancy about whether an episiotomy was performed or whether the attending physician was actually in the room does not justify discrediting the otherwise credible evidence that the baby was ROA. These discrepancies in the delivery summary were developed during cross-examination and apparently discounted by the trial court. The standard for discrediting the witnesses's testimony and evidence on this important point, i.e., "where documents and objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story," clearly was not met in this case. See Rosell, supra at 844-45.
The evidence presented to the medical review panel that the baby's position was ROA appeared to be the primary reason that they found that the defendants were not negligent in this case. As explained by Dr. Stevens, a member of the Medical Review Panel in this case:
Q. Your opinion in that case and the unanimous opinion of the Panel was that there was no deviation of the standard *654 of care by any of the defendants in this matter.
A. That is correct.
Q. As we sit here today are you still of that opinion?
A. Yes, I am.
Q. Now, your reasons . . . that I'd like to direct you to, first of all, number one, that the Panel noted that the child was an ROA presentation, and that is based on your review of the medical records?
A. That is correct.
Q. As well as the depositions that were submitted to you in the written submission?
A. That is correct.
Q. Now, in Number two here, we talk about "The left shoulder would be impacted and the injury would be to the left arm. This baby suffers from Erb's palsy on the right." Why is that significant?
A. It is significant because of the mechanisms of injury. If the left shoulder would have been impacted then what you do, you have to relieve the impaction. So the first thing you do is you do some downward traction on the neck to relieve the shoulder, the left shoulder, from underneath the pubic symphysis. And basically in a shoulder dystocia what happens is that the width of the shoulder is so wide that you have a mechanical barrier, i.e., the pubic symphysis, that the shoulder can't negotiate underneath the pubic symphysis before delivery. So, what you have to do is you have to give some gently traction to relieve. You do tractions on the head. You also do some anterior pressure, which is the suprapubic pressure where you are actually taking your hand and you try to push that shoulder underneath the pubic symphysis, or you have some gentle traction.
You also do the McRoberts, which is you hyperflex the legs so that you have a little bit deeper room in the pelvis so that the shoulder can negotiate underneath the pubic symphysis. And all of the actions in this case when the baby is right occiput anterior would be on the left shoulder and the left arm, not the right. And actually the mechanism of relieving the shoulder dystocia is you pull downward. In order to have a right Erb's palsy, it is very unlikely that you have a right shoulder palsy from a right occiput anterior, and that is why we took the time to enumerate that in the reasons of the Opinion, because if you have a right occiput anterior then I have not seen a shoulder dystocia that resulted in Erb's palsy on the opposite side.
Q. Because the mechanism of injury is the stretching between the head and the shoulder.
A. That is correct.
Q. And if the left shoulder is stuck it is the left shoulder that gets injured.
A. That's correct.
Q. And, in fact, you are not stretching at all  there is no stretching that goes on between this right shoulder in the head if you are applying downward traction.
A. It is the other way around, in fact.
Q. You are actually compressing?
A. Correct, because you don't deliver the right shoulder. You deliver the left shoulder. That is the whole point. Once you deliver the left shoulder, then the right shoulder just comes right out.
Q. So, there is no evidence that you can see in any of the medical records that any of the physicians applied any traction to the right shoulder of the child?
A. No. In fact, if you did that you would even further lodge the left shoulder *655 underneath the pubic symphysis, so if you pull up on the head the shoulder is already stuck, and if you pull up you push that shoulder even higher up into the pelvis, which would make your delivery even less likely, so all the maneuvers that we do from the gentle traction down to the suprapubic pressure, to the McRoberts maneuver, is designed to deepen the pelvis to push the shoulder underneath the symphysis and not actually push the shoulder into the symphysis. So, traction upwards would actually lodge it even further into the symphysis.
Q. Did you see from Dr. Javate's deposition where he noted that he applied gentle downward traction?
A. Yes.
Q. That is an appropriate maneuver to get that shoulder out from underneath the pubic bone?
A. Yes, it is.
Another member of the Medical Review Panel, Dr. Culotta, testified by way of deposition that based on the evidence that the presentation was ROA, that in his opinion the right arm could not have been injured by excessive pulling on the head of the baby because there was no rigid structure for the right shoulder to get stuck on. In fact, he stated that it seemed "impossible" for the right arm to be injured during the vaginal delivery and that it did not matter how much traction was applied, you cannot injure the posterior arm in that way. In addition, Dr. Gherman's article, attached as an exhibit to Dr. Culotta's deposition and cited supra at footnote 4, states that "the findings of brachial plexus injury in the posterior arm of infants with antecedent anterior shoulder dystocia or associated with cesarean delivery strongly suggests an in utero mechanism."
Plaintiffs presented the expert testimony of Dr. O'Leary, an expert in shoulder dystocia and resulting injuries. Dr. O'Leary testified that the proper handling of shoulder dystocia is to cut an episiotomy, and then to apply suprapubic pressure and the McRoberts maneuver while applying gentle traction at a 45 degree angle. In his opinion, that would resolve 80-90% of the cases. However, if those did not work, the Wood's corkscrew should be performed. While Dr. O'Leary testified that it was below the standard of care not to cut an episiotomy[11] and to ask the mother to push while the baby's shoulders were impacted, it was his professional opinion that the injury was caused by excessive force applied to the baby's head in the face of the shoulder dystocia diagnosis.
Dr. O'Leary testified, in spite of all the direct medical evidence in this case, that based on the injury in this case, he did not believe that the baby's position could have been ROA. In his view, it was much more probable that the baby was LOA and that the doctors applied excessive downward pressure, which in turn caused the brachial plexus injury to the right shoulder and arm. However, he also testified that if the baby was indeed ROA, then the doctors must have applied excessive upward traction, and pointed to medical literature that indicated that in brachial plexus injury cases, 8-10% have been to the bilateral or posterior shoulder. Finally, he testified that while gentle downward traction was the standard of care, in this case, in order to produce the injury that his baby suffered, the doctors would have had to applied 100 pounds of force, either upward or downward, and that the force involved in a normal delivery is only 5-10 pounds. In *656 Dr. O'Leary's view, there was no way this brachial plexus injury could have occurred in the absence of excessive pulling on the baby's head. Drs. Culotta and Stephens disputed that 100 pounds of force could have been applied to the baby's head, testifying that 100 pounds was a "tremendous" and "extraordinary" amount of force, enough to decapitate the baby.
Dr. O'Leary also testified that the posterior shoulder could get stuck on the posterior sacral promontory, as well as the anterior pubic bone, and that excessive upward traction would cause stretching on the right shoulder that was caught on the sacral promontory. While it is a medically accepted fact that shoulder dystocia can result by the posterior shoulder being caught on the sacral promontory, both Drs. Culotta and Stephens testified that the sacral promontory is so high up in the pelvis, that if a shoulder becomes stuck in that manner, the head will not make it through the birth canal and, in this case, the head was clearly through the birth canal.
In light of the above evidence, the judge had a reasonable factual basis to reject the plaintiffs' theory that excessive traction produced the baby's brachial plexus injury. All the direct medical evidence indicated that the baby's position was ROA. The trial judge apparently credited the testimony of Drs. Javate and Shobeiri, who testified that they applied only gently downward traction, over the imprecise testimony of Shawn Jr.'s grandmother, or the opinion of Dr. O'Leary, who testified that the doctors must have applied over 100 pounds of force in order to produce this injury. The trial judge could also have credited the testimony of Drs. Culotta and Stephens, that a right shoulder brachial plexus injury was highly improbable, if not impossible, when the baby is ROA and the left shoulder is stuck on the anterior pubic bone. The judge also had a reasonable factual basis to reject the plaintiff's theory that either: (1) the baby was actually LOA and excess downward traction caused the injury, because the direct medical evidence was that the baby was ROA; or (2) that the baby was ROA and excessive upward traction caused the injury, because the direct medical evidence was that only downward traction was applied and because the defendants presented evidence that a posterior shoulder injury could not occur in this manner because there was no rigid structure for the posterior shoulder to become stuck upon when the head has already delivered.
The other major issue in this case was the medical review panel's finding, and subsequent testimony of its members at trial, that the injury in this case was caused by a "yet unknown intrauterine mechanism." With regard to this finding, the court of appeal found as follows:
Finally, we have the medical review panel testimony which fails to shed any light on the possible causes of the child's injury, other than to attribute the cause of the injury to unknown intrauterine forces. However, the weight to be given expert testimony is dependent upon the facts on which it is based as well as the professional qualifications and experience of the expert. If the opinion is based upon facts not supported by the record, the opinion may be rejected. Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229, 236 (citing Thomas v. Petrolane Gas Service Ltd. Partnership, 588 So.2d 711, 719 (La.App. 2 Cir.1991)). Our review of the record indicates that the medical review panel's finding that the injury was caused by an extensive unknown intrauterine force is not supported by the record or the medical reports.
904 So.2d at 959.
However, this finding by the court of appeal is wrong. There was ample evidence *657 in the record that a brachial plexus injury can occur for unknown reasons. For example, an ACOG Practice Bulletin, prepared by the American College of Obstetricians and Gynecologists for the Clinical Management Guidelines for Obstetrician-Gynecologists for Shoulder Dystocia from November 2002 (the "ACOG Bulletin") and admitted into evidence, described the incidence of brachial plexus injuries as follows:
Brachial plexus injuries and fractures of the clavicle and humerus as associated with shoulder dystocia. The reported incidence of brachial plexus injuries following a delivery complicated by shoulder dystocia varies widely from 4% to 40%. [ ] Fortunately, most cases resolve without permanent disability; that is, fewer than 10% of all cases of shoulder dystocia result in persistent brachial plexus injury. Data suggest that a significant proportion (34-47%) of brachial plexus injuries are not associated with shoulder dystocia; in fact, 4% occur after cesarean delivery. (Emphasis added).
Further, Dr. Robert Gherman's article concluded that 50% of all brachial plexus injuries may be attributable to unavoidable intrapartum or antepartum events and not to the actual management of the shoulder dystocia. Dr. Culotta explained that the article indicated that many of the brachial plexus injuries are occurring intrauterine during the development of the baby or during the alignment of the baby just prior to the initiation of labor. As to the possible mechanisms that could lead the author of the studies to conclude that a brachial plexus injury could occur in the absence of shoulder dystocia, Dr. Culotta explained:
Well, they propose one that may be related to a mycoplasm infection. They tell you it may be just related to normal forces of labor. It may be issues relative to the way the child develops in abnormal intrauterine pressure at the time of delivery or during the labor of the pregnancy. Position that the baby may be in and with some contractions may have caused it. And there really I think the best way for me to phrase it is to just quote them in a comment that they say "that almost all the information concerning the relationship between delivery, shoulder dystocia, and brachial plexus injury has been collected retrospectively and therefore, has an inherent ascertainment bias. Some of the "no shoulder" brachial plexus injuries may actually have represented nonrecognition or incomplete documentation . . ." "Shoulder dystocia continues to represent a largely unpredictable obstetric emergency . . ." And I think that's the real key and that we still don't have enough data to say how it happens.
Dr. O'Leary dismissed this study as misleading, because the medical staff documenting certain of these deliveries could have failed to note that the baby had a shoulder dystocia complication. He also disputed that the natural forces of labor could cause a brachial plexus injury because the forces of labor "come from the top and delivery is very much like squeezing toothpaste out of a tube." However, Dr. O'Leary agreed with the statement that "the presence of a brachial plexus injury in a shoulder dystocia case does not in and of itself indicate a breach of the standard of care," albeit noting that in his view this would occur in only about 1% of cases.
Dr. Stephens testified that the ACOG Bulletin was relied on by the Medical Review Panel in reaching its decision and that "it is a known and accepted fact that brachial plexus injuries can occur in the absence of shoulder dystocia and in the absence of vaginal delivery." Dr. Winfield, another member of the Medical Review *658 Panel, testified that he had witnessed a brachial plexus injury that occurred without shoulder dystocia. He also opined that the forces of labor could have caused the tearing away of the C-5 nerve root and that the uterus is no longer soft tissue after the mother's water has broken and the baby is no longer floating in water.[12] Dr. Javate testified that he had read studies where brachial plexus injuries can occur without any dystocia during an elective cesarian section. In explaining why he thought this baby had a right-sided brachial plexus injury given the fact that it was the left shoulder that was trapped behind the pubic bone, Dr. Culotta stated:
I can only surmise that it was one of those rarer situations when something going on in the intrauterine milieu prior to delivery when that could have been injured. And though there are now well documented evidence in the literature that there may be actually an intrauterine cause for this injury and not a purely delivery mechanical cause, and there are actually case reports of women who deliver by cesarean section that have these kind of shoulder dystocia or brachial plexus injuries.
. . .
And it's most likely that this injury based upon our increasing knowledge of brachial plexus injury probably occurred prior to the delivery and not as a result of the delivery. And at this point in time I don't think we know enough medicine to tell you why it always happens, but we do believe that it happens for reasons we're not clear of prior to delivery.
This evidence clearly provides a reasonable factual basis for the trial judge to find that the plaintiffs did not prove their case. The trial judge's specific finding that "I just don't know what happened, I don't think anybody really knows what happened," does not merely indicate that she did not know which side to believe, but is in line with the medical evidence presented that in some cases brachial plexus injuries occur for unknown reasons that are unrelated to shoulder dystocia.
In light of the conflicting evidence presented in this case, we find clear error in the court of appeal's reversal of the trial court's judgment based on the court of appeal's conclusion that "our review of the record indicates that the plaintiff's testimony and expert witnesses are more credible than the defendants." 904 So.2d at 959. This is a textbook example of an impermissible finding under the manifest error standard of review because the law requires that "even where the reviewing court may believe that its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appeal where the record merely demonstrates conflicting testimony as to the facts at issue, and the fact finder chooses to believe one version, rather that the other." Stobart, supra at 882.[13]
*659 The court of appeal also erred in applying the doctrine of res ipsa loquitur to this case. Res ipsa loquitur is a rule of circumstantial evidence which allows a court to infer negligence on the part of the defendant if the facts indicate the defendant's negligence, more probably than not, caused the injury. Spott v. Otis Elevator Co., 601 So.2d 1355, 1362 (La. 1992); Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 664 (La.1989), on rehearing. "The doctrine applies only when the facts of the controversy `suggest negligence of the defendant, rather than some other factor, as the most plausible explanation of the accident.'" Montgomery v. Opelousas General Hosp., 540 So.2d 312, 320 (La.1989) (citing Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1048 (La.1979); Boudreaux v. American Insurance Co., 262 La. 721, 264 So.2d 621, 636 (1972)). "Application of the doctrine is defeated if an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as one that it was due to his negligence." Id.
As we stated earlier, the evidence in the record provides a reasonable factual basis for a finding that this accident occurred in the absence of negligence. In spite of the evidence that a brachial plexus can occur in the absence of shoulder dystocia, the court of appeal supports the application of the doctrine of res ipsa loquitur because of "undisputed evidence that the stretching of the brachial plexus nerve does not occur without excessive force." 904 So.2d at 960. This finding ignores the medical evidence presented by defendants that brachial plexus injuries sometimes occur for reasons that are unknown and that occur even in the absence of shoulder dystocia. The court of appeal then attempts to support the application of this doctrine with its finding that "[t]he medical testimony conflicts, however, as to whether the injury occurred in the absence of negligence," and then finds that "the plaintiffs' testimony is more convincing than that of the defense witnesses." Id. at 960, 961. For the same reasons as stated above, this is an erroneous application of the manifest error standard of review. Because an inference that the accident was due to a cause other than defendants' negligence can be drawn as reasonably as one that it was due to their negligence, the doctrine of res ipsa loquitur is inappropriate in this case.

CONCLUSION
Although brachial plexus injuries sometimes occur in connection with shoulder dystocia when excessive traction is applied to the baby's head, the evidence presented in this case provided a reasonable factual basis for the trial court to find that the plaintiffs did not prove that either Dr. Javate or Shoebari was negligent in his treatment of the shoulder dystocia or that such negligence caused the brachial plexus injury. That the baby presented ROA was supported by substantial direct medical evidence. Members of the Medical Review Panel testified that in this position, an injury to the right arm was highly unlikely. *660 Further, Dr. O'Leary's testimony that if the baby was ROA, one of the doctors must have applied excessive upward traction, was disputed by the direct medical evidence. Finally, evidence in the record supports the Medical Review Panel's finding that brachial plexus injuries are known to occur even in the absence of shoulder dystocia. Thus, it was reasonable to conclude, as the Medical Review Panel did, and as the trial judge implicitly did, that there was no basis for finding, more likely than not, that the defendants caused the baby's injuries or that they violated the standard of care. The manifest error standard of review requires that even where the reviewing court may believe that its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appeal where the record merely demonstrates conflicting testimony as to the facts at issue, and the fact finder chooses to believe one version, rather than the other.
Further, because an inference that the accident was due to a cause other than defendants' negligence can be drawn as reasonably as one that its was due to their negligence, the doctrine of res ipsa loquitur is inappropriate in this case.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed and the trial court judgment is reinstated.
REVERSED.
CALOGERO, Chief Justice, dissents.
JOHNSON, Justice, dissents and assigns reasons.
JOHNSON, Justice, dissenting.
I respectfully dissent from the majority's holding that the evidence does not support a finding of medical malpractice. The defendants were clearly liable in the treatment of this baby's shoulder dystocia. The negligent treatment resulted in him suffering a brachial plexus injury leaving his right arm permanently dysfunctional.
In a medical malpractice action, the plaintiff has the burden of proving: 1) the degree of knowledge or skill possessed or degree of care ordinarily exercised by physicians within that medical specialty; 2) that defendant either lacked such degree of knowledge or skill, or failed to use reasonable care and diligence along with his best judgment in application of that skill; and 3) that as result, injuries were sustained that would not have otherwise occurred. LSA-R.S. 9:2794. In a medical malpractice case, the physician is found to be negligent when the physician violates the applicable standard of care, and that violation results in the plaintiff's injury. Williams v. Memorial Medical Center, 03-1806 (La.App. 4 Cir. 3/17/04), 870 So.2d 10441. The test for determining casual connection between the physician's negligent treatment and the sustained injury is whether the testimony proves that it is more probable than not that the injuries were caused by the substandard care of the physician. Leblanc v. Barry, 00-709 (La.App. 3 Cir. 2/28/01), 790 So.2d 75. When the physician's actions fall below the ordinary standard of care expected of physicians in his medical specialty and those actions cause an injury to his patient, the physician is liable to the patient for damages.
A physician has a duty to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. Coleman v. Deno, 01-1517 (La.1/25/02) 813 So.2d 303. A physician owes a duty to a parents of the child not to negligently injure the child during the birth process. Skorlich v. East Jefferson *661 Gen. Hosp., 478 So.2d 916 (La.App. 5th Cir.1985); Young v. Louisiana Medical Mut. Ins. Co., (La.App. 5 Cir., 12/16/98), 725 So.2d 539.
In the case sub judice, the record demonstrates that Mrs. Salvant's pregnancy and the development of her unborn child were relatively uncomplicated, i.e. "normal." It is also undisputed that labor initially progressed normally, but during the delivery process, shoulder dystocia developed. In this condition, the baby's shoulder became impacted against the mother's pubic bone. It is further undisputed that the treating physician, Dr. Javate, who was a first year resident having only two months of experience in labor and delivery, had some difficulty in properly completing the delivery of the child as a senior physician, Dr. Shoebieri, had to complete the delivery. As stated by the court of appeal, there are "several accounts of varying procedures performed or documented as having occurred during the delivery," however, Dr. Javata acted below his standard of care when he instructed Mrs. Salvant to push during a delivery when shoulder dystocia is present. Dr. Javata's actions of pulling on the baby's head, i.e. applying traction, which was witnessed by the nurse, was a clear indication of deviating from the acceptable standard of care. Being a first year resident, although inexperienced in practice, Dr. Javate should have been familiar with the proper procedures to successfully manage the impacted shoulder. However, he failed to act within the proper standard of care, which mandated the immediate assistance of Dr. Shoebieri, who completed the delivery. As a result of Dr. Javata's negligence, this baby's brachial plexus nerve was torn away from his C-5 nerve root, which left his right arm permanently disabled. There is no other explanation for the torn nerve except the negligence of the defendants. The prospect of a life without the use of an arm is difficult to quantify in a damage award, but must be compensated. See also, Hollingsworth v. Bowers, 96-257 (La.App. 3 Cir., 12/30/96), 690 So.2d 825.
Accordingly, in my view, the trial court erred in finding for the defendants and dismissing the plaintiffs' claim. I would affirm the appellate court's award of damages.
NOTES
[1] Ms. Salvant's pregnancy was uneventful and all pre-natal findings were normal.
[2] It is unclear who called them into the room.
[3] The brachial plexus is the major group of nerves from the spinal cord to the arm.
[4] According to an article in the record by Robert. B. Gherman, M.D., Brachial Plexus Palsy: An In Utero Injury?, American Journal of Obstetrics and Gynecology, Vol. 180, No. 5 (May 1999), brachial plexus injuries involving the C5-6 nerve roots are commonly identified as Erb-Duchenne palsy, and more than 90% of these will resolve by one year of life, with only a 5%-8% rate of persistent nerve injury. Brachial plexus injuries involving the C8-T1 nerve roots are classified as Klupke's palsy and only 40% of these injuries can be expected to resolve at one year.
[5] Dr. Meadors Jones was later voluntarily dismissed from the suit after it was determined that she did not participate in the delivery of the baby.
[6] Plaintiffs, relying on the isolated case of Bloxom v. Bloxom, 512 So.2d 839 (La.1987), superceded by statute as stated in Kampen v. American Isuzu Motors, 119 F.3d 1193 (5th Cir.1997), argue that because the trial court did not give detailed reasons or explain its factual findings, the trial court's judgment is not entitled to the usual deference. In Bloxom, the trial court made specific factual findings in awarding damages to plaintiffs in a products liability case, but did not articulate the evidentiary basis for its findings. In reviewing the trial court's factual finding that the exhaust system in the car, particularly the catalytic converter, was unreasonably dangerous to normal use, Justice Dennis made the following statements:

. . ., we are unable to give this finding the usual deference attributed to the decisions of triers of fact at the trial level. The trial court's reasons do not articulate the theory or the evidentiary facts upon which its conclusion is based. Nor can we infer from the trial court's reasons and the record the theory under which the trial court found the product to be unreasonably dangerous to normal use. Although we may accord deference to a decision of less than ideal clarity if the trial court's path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record, we will not supply a finding from the evidence or a reasoned basis for the trial court's decision that it has not found or that is not implied. Cf. Save Ourselves v. La. Environ. Cont. Com., 452 So.2d 1152 (La. 1984); Giallanza v. LPSC, 412 So.2d 1369 (La.1982); Baton Rouge Water Works v. Louisiana Public Service Com'n, 342 So.2d 609 (La.1977); cf. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); 3 K. Davis, Administrative Law Treatise § 14:29 (1980) at 130.
512 So.2d at 843-44. Contrary to plaintiffs' argument, this statement does not stand for the broad proposition that a trial court judgment that does not spell out its reasons for judgment is not entitled to the manifest error standard of review. When viewed in light of the fact that most jury verdicts are inherently conclusory in nature, such a holding would wreak havoc on the appellate review system. In any event, in this case, the reasons for the trial court's judgment are necessarily and clearly implied by the record.
[7] It is unclear from the record who, if anyone, yelled stop, and to which actions the "stop" command referred.
[8] Although plaintiffs' expert, Dr. Leary, stated that "under no circumstances should one apply traction to the infant's head while the child's shoulders are impacted," he also testified that, in conjunction with the McRoberts maneuver and suprapubic pressure, the doctor should also "use gentle traction at about a 45 degree angle."
[9] The court of appeal erroneously explained the positioning of the baby's head as follows:

These acronyms, "ROA" and "LOA," refer to the positioning of the child's head once it has been delivered and the shoulders remain in the birth canal. A child's position is "ROA" (right occiput anterior) when his head faces the mother's left thigh with the right shoulder being in the anterior or top position, while "LOA" (left occiput anterior) position points the child's head facing the mother's right thigh. In this position, the left shoulder is in the anterior position.
Whether this erroneous belief had anything to do with the court of appeal's decision to rule in favor of the plaintiffs is unclear.
[10] A fact established by direct evidence is one which has been testified to by witnesses as having come under the cognizance of their senses. J. Wigmore, Evidence § 25, at 954 (1983).
[11] The ACOG Bulletin, cited at page 14, infra, stated that "[c]ontraversy exists as to whether episiotomy is necessary, because shoulder dystocia typically is not caused by obstructing soft tissue."
[12] While Dr. Winfield testified on cross-examination at trial that he did not know the C-5 nerve root was "pulled out" of the spinal cord, he testified that the natural forces of labor could still cause that type injury. However, immediately after issuing their opinion, all the members of the Medical Review Panel, including Dr. Winfield, confirmed that they knew this injury was an "evulsion" type injury, or a "tearing away or significant injury to the nerve root."
[13] The court of appeal relied heavily on Williams Obstetrics, 20th Edition. For instance, the court of appeal finds that "our review of the court record revealed expert testimony which contradicted widely held teachings found in Williams Obstetrics." 904 So.2d at 955. The court of appeal cites Williams Obstetrics for its proposition that "traction should not be applied to an infant's head while his shoulders are impacted." Id. Finally, the court of appeal opines that "while we may have two conflicting views of the possible causes of the injury, Dr. O'Leary's opinions are consistent with the widely held practices of the profession outlined in Williams Obstetrics." Id. at 959. However, while, as the court of appeal notes at footnote 6, Williams Obstetrics was referenced during trial, the only part of Williams Obstetrics that was introduced into evidence was one page which pictured the McRoberts maneuver, suprapubic pressure and the Woods corkscrew and which explained certain other maneuvers.