LOLLEY, J.
hln this medical malpractice case, plaintiffs, Joshua Morris and Jeremy Watson, appeal a judgment from the Second Judicial District Court, Parish of Jackson, State of Louisiana, wherein a jury found in favor of defendant, Dr. Dirk Rainwater, M.D. For the following reasons we affirm the judgment of the trial court.
FACTS
On June 13, 2011, at approximately 1:15 p.m., Charlotte Leach, then a 50-year-old white female, presented in the Jackson Parish Hospital (“JPH”) emergency room in Jonesboro, Louisiana, with complaints of a headache and abdominal pain which had begun three days prior. Leach was triaged by the nursing staff, and her vitals upon arrival were: blood pressure 64/41 mm Hg; pulse of 91 beats per minute; respira-tions of 22 breaths per minute; and temperature 97.9 degrees Fahrenheit. At approximately 1:30 p.m., Leach was assessed by Dr. Dirk Rainwater, the physician on duty in the JPH emergency room.
Dr. Rainwater ordered blood and urine cultures, multiple • laboratory tests,' and multiple radiographic tests on Leach. Several of these came back abnormal: her white blood cell count was high; her glucose was low, indicating she was hypoglycemic; blood urea nitrogen and creatinine were elevated, indicating dehydration. Leach’s critically high creatinine level and white blood cell count were cause for concern. A drug screen was positive for ben-zodiazepines, and urinalysis revealed a urinary tract infection. Based on these results, Dr. Rainwater ordered intravenous fluids every six hours, Protonix 40 mg every four hours, and one dose of Roce-phin, an antibiotic. Although vitals were continuously, monitored, the single dose of intravenous |2Rocephin was the only antibiotic administered to Leach during the two days she stayed in JPH under Dr. Rainwater’s care.
All radiographic studies of the chest, brain, sinuses, and abdomen were essentially normal. The results of an ultrasound of the abdomen showed some biliary sludge suggestive of possible extrahepatic biliary obstruction (blockage of the normal flow of bile from the liver to the intestinal tract). Based on these laboratory tests and reports, Dr. Rainwater made a primary diagnosis of hypotension (i.e., low blood pressure) and a secondary diagnosis of abdominal pain. Leach was given pain medication and admitted to JPH for observation. Dr. Rainwater was also the acting hospitalist, and Leach remained under his care during overnight observation. •
Leach’s blood pressure rose slightly after admittance to JPH. The night of June 14, Dr. Rainwater arranged for Leach’s transfer 'to Louisiana State University Hospital—Shreveport (“LSUHSC”) in the morning. Although Leach remained hypo-tensive, during the 42 hours from admittance to departure for LSUHSC, the JPH blood pressure chart shows that, upon departure, Leach’s blood pressure was raised to 96/60, but still within the hypotensive range. Vitals taken before Leach’s departure'also show lowering of her creatinine level, but it still remained high, and improvement, in white blood cell count to *230 within normal range. As she departed from JPH and Dr. Rainwater’s care, Leach continued to complain of a headache and abdominal pain.
Leach arrived at LSUHSC at approximately 12:30 p.m. on June 15, 2011. A detailed history and updated vitals were obtained by LSUHSC staff. The initial evaluation at LSUHSC found Leach to be in mild distress, with mild diffuse coarse breath sounds, and her abdomen was soft with |3diffuse tenderness and positive bowel sounds. She was diagnosed with abdominal pain, gram negative rod bacteremia, pyuria (white blood cells in urine—sometimes indicative of a urinary tract infection), extrahepatic bowel duct obstruction, recent hypotension, and thrombocytopenia (low blood platelet count). Leach received intravenous antibiotics and various adjustments were made to Leach’s treatment regimen while she was at LSUHSC. On June 16, Zosyn was discontinued and Pri-maxin 250 mg was started. On June 17, additional antibiotics were added to treat a bacterial infection. A CT scan of the abdomen taken at LSUHSC revealed cirrhosis (liver disease), splenomegaly (enlarged spleen), .and possible pneumatosis intesti-nalis (gas cysts in the bowel wall). The radiologist did not compare the scan taken at LSUHSC to the liver scan taken at JPH two days prior.
Over the next few days at LSUHSC, Leach’s condition continued to decline. She suffered from increased intracranial pressure, uncontrolled seizure activity, and her liver began to fail. On June 21, after 6 days at LSUHSC, ventilator support for Leach was discontinued at her family’s request, and she died shortly thereafter. Leach’s cause of death is listed as multiple organ failure, sepsis, and cirrhosis.
Almost a year after their mother’s death, Joshua Morris and Jeremy Watson filed a complaint alleging the care provided to Leach by JPH and Dr. Rainwater failed to meet the accepted standard of care. This complaint was heard by a medical review panel (“MRP”) composed of Dr. Brian Caskey, Dr. Don Bell, and Dr. Philip Conner. After reviewing Leach’s medical records and the submitted depositions by Dr. Rainwater and plaintiff expert, Dr. Walter Simmons, the MRP found JPH did not fail to meet an acceptable standard of care. However, the MRP concluded Dr. Rainwater |4had deviated from the standard of care required of an emergency room physician, stating:
In order to address her complaints, [Dr. Rainwater] ordered appropriate lab work and studies to be performed on her in seeking to determine exactly what was going on with this patient. She was a patient he was somewhat familiar with as a result of several other presentations to the hospital emergency room.
The lab work that he ordered indicated that she had a significant elevated level in her white count and also determined that she was suffering from a UTI. In our view, Dr. Rainwater should have ordered more aggressive antibiotic therapy at that point and the administration of antibiotics with careful monitoring should have been continued until her transfer to LSU-Shreveport. It is clear to us that he recognized the patient was not improving at the rate that would be expected. Additionally, we believe that his failure to recognize that this patient was in septic shock was a clear deviation from the accepted standard of care.
These failures were deviations from the accepted standard of care for an emergency room physician under the circumstances in this case. We conclude that these deviations resulted in the alleged resultant damages, namely, death of this patient from septic shock.
*231 On May 28, 2014, Watson and Morris filed a petition for damages against JPH, Dr. Rainwater, and his malpractice insurance, Louisiana Medical Mutual Insurance Company. Subsequently, JPH was dismissed by summary judgment. At the conclusion of the trial, Morris and Watson made a motion for directed verdict, which was denied. The jury returned a verdict that Dr. Rainwater’s treatment of Leach did not fall below the requisite standard of care. Morris and Watson now appeal that judgment.
DISCUSSION
Appellants set forth four assignments of error in this appeal, arguing in one that the jury is manifestly erroneous in its verdict finding that plaintiffs did not prove by a preponderance of the evidence that Dr. ^Rainwater breached the standard of care in his treatment of Leach. Appellants claim that Leach’s vitals and the results of the tests ordered by Dr. Rainwater when Leach first presented in the JPH emergency room showed signs of organ failure and septic shock due to hypo-tension and infection. Appellants argue that Dr. Rainwater gave Leach only one dose of Rocephin, which was not adequate to treat her condition, more aggressive treatment would have saved her life, and the jury erred by not finding so. We disagree.
The jury’s finding in a medical malpractice case is subject to manifest error review; it cannot be set aside unless the appellate court finds- that it is manifestly erroneous or clearly wrong. Stobart v. State through Dep't of Transp. & Dev., 617 So.2d 880 (La. 1993); Bailey v. Donley, 44,919 (La.App. 2 Cir. 12/9/09), 26 So.3d 987, 990-91. In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirety and find that (1) a reasonable factual basis does not exist for the finding; and, (2) the record establishes that the fact finder is clearly wrong or manifestly erroneous. Id. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 2001-2217 (La. 4/3/02), 816 So.2d 270; Bailey, supra.
Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Salvant v. State, 2005-2126 (La. 7/6/06), 935 So.2d 646. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. Mistich v. Volkswagen of Germany, Inc., 1995-0939 (La. 1/29/96), 666 So.2d 1073, opinion reinstated on reh’g, 95-0939 (La. 11/25/96), 682 So.2d 239; Volentine v. Raeford Farms of Louisiana, LLC, 50,698 (La.App. 2 Cir. 8/15/16), 201 So.3d 325, 347, writ denied, 2016-1925 (La. 12/16/16), 212 So.3d 1171, 2016 WL 7638429, and writ denied, 2016-1924 (La. 12/16/16), 212 So.3d 1171, 2016 WL 7638427. This language places the responsibility of determining which expert was more credible on the fact finder. Id. A fact finder may evaluate expert testimony by the same principles that apply to other witnesses and has great discretion to accept or reject expert or lay opinion. Id. The weight to be accorded to testimony of experts depends largely on their qualifications and the facts upon which they base their opinions. Boone v. Top Dollar Pawn Shop of Bossier, LLC, 50,493 (La.App. 2 Cir. 2/24/16), 188 So.3d 1093. Causation is a factual finding which should not be reversed on appeal absent manifest error. Detraz v. Lee, 2005-1263 (La. 1/17/07), 950 So.2d 557; Bailey, supra.
*232 To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) the defendant breached that standard of care; and (3) there was a causal connection between the breach and the resulting injury. La. R.S. 9:2794. In a medical malpractice case, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
|7(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
See La. R.S. 9:2794(A); Salvant, supra.
Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Samaha v. Rau, 2007-1726 (La. 2/26/08), 977 So.2d 880. Expert testimony is also required to establish whether a breach of the standard of care caused injury to the plaintiff. Schultz v. Guoth, 2010-0343 (La. 1/19/11), 57 So.3d 1002.
Where there are conflicting expert opinions concerning the defendant’s compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact. Bailey, supra. Here, in addition to the MRP’s decision, the jury had the opportunity to hear testimony from experts on both sides.

Witness Testimony

Plaintiffs first called Percy Ford, attorney-chairman for the MRP, to explain how the MRP is selected and the process by which the panel comes to a decision. He explained that the panel reviewed the Jackson Parish ambulance report, Leach’s certificate of death and medical records, along with expert reports from both sides. He also informed the jury that the panel never met in person and only conferenced by telephone.
|sThe jury next viewed a video deposition by Dr. Curtis Partington, expert radiologist, who essentially stated that the CT scan of Leach’s liver ordered by Dr. Rainwater and taken at JPH showed a normal liver.
The plaintiffs then called Dr. Rainwater, entered as an expert in general practice and emergency medicine, and cross-examined him on his treatment of Leach. Dr. Rainwater explained that Leach did not present with the typical symptoms of someone in septic shock. He further testified being familiar with the symptoms of sepsis, because he sees septic patients frequently in the emergency room. Dr, Rainwater informed the jury that he knew Leach as a patient. He was aware of her history of low blood pressure, smoking for over 36 years, Chronic Obstructive Pulmonary Disease (“COPD”), untreated Hepati *233 tis C, pre-existing liver disease, cirrhotic liver, and prior hospital admissions in connection with her illicit use of street drugs and alcohol. Dr. Rainwater pointed out that even after two days at LSUHSC, Leach still had not been diagnosed with sepsis, and of her time under his care at JPH, he noted:
She was able to get up within two hours of me putting her on the floor at JPH and walked down the hall and smoked. She was able to get up and shower. She was able to eat. She was able to drink. She was able to get up and use the toilet. This is a normal person. This isn’t somebody that’s debilitated septic in the bed that’s unresponsive or barely able to communicate with the physician.
Dr. Partington had stated the JPH CT scan showed a normal liver, but Dr. Rainwater disagreed with this, stating that as-cites on the liver were not normal and the spleen was enlarged, which is indicative of chronic conditions that weaken the body. Dr. Rainwater explained that his care of Leach included CT scans, intravenous antibiotics, laboratory tests, a full cardiac workup, and a sufficient amount of intravenous fluid. He further 13explained that congestive heart failure patients, like Leach, have fluid retention issues which require a physician to carefully monitor the amount of fluids given to a patient (fluids are necessary to raise blood pressure when a patient is hypotensive).
The jury also heard testimony from Dr. Phillip Connor, MRP member, board certified in family practice and sleep medicine, currently practicing in Lake Charles, Louisiana, and offered as an expert in family medicine. He explained to the jury that sepsis by definition is an infection of the blood stream associated with end organ damage. He also explained that hypoten-sive patients have blood vessels that cannot retain fluid, so fluid leaks out causing low blood pressure; the purpose of blood is oxygen delivery, and if no oxygen is delivered to the organs they die. Dr. Con-nor stated he would have continued to give Leach more antibiotics, because .even though a patient does not appear ill and can still smoke does not indicate she is not sick.
Dr. Connor opined that Leach’s enlarged spleen was a hallmark sign of the body fighting infection, maybe indicating sepsis. He also’ stated that an enlarged spleen is common in patients with cirrhotic livers. He testified that Leach’s history of drug and alcohol abuse actually put her at greater risk for sepsis. He further statecl that the MRP determined Dr. Rainwater ordered all the appropriate tests for Leach, did not talk about her history of alcoholism, drugs, COPD or elevated liver enzymes, but still felt more antibiotics should have been administered; therefore, the panel agreed Dr. Rainwater’s treatment of Leach feel below the acceptable standard of care.
Dr. David Morro, an expert in emergency medicine and critical -care who practiced in Phoenix, Arizona, was- called by plaintiffs to testify about a hpreview he wrote concerning sepsis. It was his opinion that Leach died from under-treatment of antibiotics and a lack of aggressive fluid resuscitation. He stated that behavior modifica^ tion has been, shown to reduce the effects of long term complications from cirrhosis. Dr. Morro’s review explained -a specific protocol for treatment of septic shock patients. On cross-examination the defense presented Dr. Morro with a medical study that stated no matter ■ how a patient is treated, by the “protocol” Dr. Morro suggested, or regular treatment, about 19% of septic patients still die regardless of th.e measures■ taken to save, their,:lives. Dr. Morro admitted that multiple studies are *234 done in every area of medicine that refute or support certain statements or protocols.
Dr. Caskey, another MRP member, was not called to testify, but his opinion was published to the jury in the interest of time. Both plaintiffs, Leach’s two sons, testified to their love of their mother and her changed life a year before her death. The jury was then shown a video deposition by Dr. Walter Simmons, an expert hired by plaintiffs from Phoenix, Arizona, who opined that Dr. Rainwater did not raise Leach’s blood pressure quickly enough. He also testified that the scan of Leach’s liver taken at JPH was normal and two days later the LSUHSC scan showed that Leach’s liver had shrunk. Dr. Simmons attributed this difference in Leach’s liver to low blood pressure, which caused an inability to perfuse her organs appropriately, and infection.
The defense called only one expert, Dr. John Haynes, expert in family practice, specifically in rural areas of Louisiana. Dr. Haynes testified to his experience treating septic patients, and emphasized that Leach did not present any of the classic signs of sepsis, specifically noting that she | n continued to have bowel movements, indicating that her organs were not shutting down. Dr. Haynes noted that the nurses’ reports, on which doctors often rely for updates on a patient’s condition, continued to state that Leach was alert, oriented, and awake. Dr. Haynes also explained that at the time of Leach’s treatment, Dr. Rainwater did not have the blood cultures (which take 48 hours to process) to show Leach had E. coli in her blood; without those laboratory test results, Dr. Rainwater had no way of knowing this information at the time Leach was under his care.
In Dr. Haynes’s opinion, Leach was not in septic shock during her time at JPH, and he specifically testified that he had never seen “anyone in shock, septic shock, or otherwise that had a normal lactate (typically during septic shock lactate elevates). When she got to LSUHSC her lactate was normal.”
In the case sub judice, the jury was presented with an abundance of expert testimony to consider. The plaintiffs presented numerous experts to bolster their theory that aggressive antibiotics during Leach’s time at JPH would have given her a better chance of survival, but not one expert could directly refute the testimony of the defense witnesses, Dr. Rainwater and Dr. Haynes. The plaintiffs’ case focused on the treatment of sepsis, while the jury was called to determine whether the plaintiffs had proven: Leach had sepsis when she presented at JPH; Dr. Rainwater failed to identify this; and, his failure to identify and treat for sepsis was a deviation from the standard of care which ultimately caused Leach a lower chance of recovery.
Two different, viable theories on Leach’s condition and the treatment she received were presented to the jury. Both sides presented expert opinions on Leach’s medical records, their personal experience, and medical 112articles reviewed in preparation for trial. The experts disputed if Leach died from sepsis or cirrhosis, but all agreed she had additional chronic illnesses due to her extensive history of drug and alcohol abuse which complicated diagnosis and led to the decline of her overall health through the years. Notably, the initial diagnosis at LSUHSC also did not include sepsis.
After a complete review of this record, we find it is possible that reasonable minds could disagree regarding the evidence presented; therefore, the jury was not clearly wrong in choosing to believe one side’s experts over the other. For that reason, we decline to disturb the jury’s verdict, *235 and this assignment of error is without merit.

Motion for Directed Verdict

In another assignment of error, the appellants claim the trial court committed legal error by denying their motion for directed verdict. A directed verdict should only be granted when the facts and inferences point so strongly in favor of one party that the trial court believes reasonable people could not reach a contrary verdict. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 718 (La. 1986). It is appropriate, not when there is a preponderance of evidence, but only when the evidence overwhelmingly points to one conclusion.
Considering our conclusion that the jury’s determination was not manifestly erroneous, the trial court’s denial of the directed was proper. Any discussion of this assignment of error is pretermitted.

Evidentiary Rulings

In another assignment of error, the appellants argue that the trial court committed legal error by allowing speculative, prejudicial testimony and literature into evidence. The appellants also argue that the trial court erred | isin allowing the report of Dr. Haynes into evidence over their objection that the report constituted hearsay, was irrelevant, cumulative, and prejudicial.
The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed on appeal absent a clear abuse of that discretion. Hays v. Christus Schumpert N. La., 46,408 (La. App. 2 Cir. 9/21/11), 72 So.3d 955, 961. On appeal, we must consider whether the complained of ruling was erroneous and whether the error affected a substantial right of the party. If not, reversal is not warranted. Id. The determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case. Id. Complaint of an alleged erroneous eviden-tiary ruling may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected. La. C.E. art. 103.
Here, the trial court allowed testimony from defense expert Dr. Haynes which appellants argue was in error due to its speculative nature. At trial, plaintiff counsel objected to the following statement by Dr. Haynes: “I don’t know exactly why and we don’t have autopsies to tell us everything. Now, she could have taken something. Who knows? I don’t know. That might have caused the problem.” This objection was sustained. Defense counsel then asked questions to clarify Dr. Haynes’s opinion that Tylenol can cause liver failure.
Q: Do you have any kind of medical literature or reference to support your opinions that you thought she was going into acute.liver failure from toxic ingestion?
A: Well, her enzymes were going up and her blood ammonia was really high, starting to elevate and did go high. So, that’s all, you know, those things are pathognomonic really of liver failure.
| UQ: ■ Yes, sir. And, I’m sorry if my question is actually, do you have any kind of medical literature which we could use to show how Ms. Leach was going into acute liver failure from toxic ingestion, any kind of medical articles used by physicians in your field?
At this point plaintiff counsel objected to Dr. Haynes testifying on any articles not entered into evidence and also to speculation on the cause of death, because Dr. Haynes mentioned there was no autopsy “so anything that he would opine as to the cause of death is purely speculative.” Defense counsel responded that any physician *236 who gives an opinion as . to the cause of death is basing that opinion on speculation. The trial court overruled this objection, stating that Dr. Haynes was qualified as an expert. Plaintiff counsel continued to object to any testimony concerning the possibility of Tylenol as a cause of liver failure. The trial court entertained one suph objection, striking the statement, “it appeared to be that it was a Tylenol overdose,” from the record, and allowed the defense the opportunity to rephrase their questions. ,
The medical article on which Dr. Haynes based his opinion was entered into evidence over plaintiffs objection that the opinion of Dr. Haynes was based on a possibility of what could happen, and that he* had not stated that his theory was <fmore probable than not.” Throughout the trial, witnesses on both sides, both expert and Ray, testified to Leach’s history of alcoholism and pervasive use of prescription and illicit drugs. Dr. Haynes reviewed Leach’s pharmacy records during his testimony and explained how her vitals taken upon presentation in the JPH emergency rpom showed liver dysfunction not necessarily attributable to sepsis.
Here, the trial court had broad discretion-in-making an evidentiary ruling on Dr. Haynes’s testimony and the report which he used to base some hBof his opinions. The trial court was within its discretion in overruling general objections to Dr. Haynes’s opinion on the cause of death being speculative, because he was qualified as an expert and able to show that his theory on Leach’s cause of death was based on her medical records and medical history. These assignments of error have no merit.
CONCLUSION
Considering the foregoing, we do not find the jury was manifestly-erroneous in its conclusion that Dr. Dirk Rainwater’s treatment of Charlotte Leach did not fall below the acceptable standard of care. We further find the trial court has not abused its discretion in this matter, and the judgment was proper. Costs of this appeal are assessed to appellants, Joshua Morris and Jeremy Watson.
AFFIRMED.
APPLICATION FOR REHEARING
Rehearing denied.
Before BROWN, CARAWAY, MOORE, LOLLEY and PITMAN, JJ.