JUDE G. GRAVOIS, Judge.
 

 |2The plaintiffs have appealed the trial court judgment in favor of the defendants involving the termination of a lease. For the reasons that follow, we affirm.
 

 FACTS AND PROCEDURAL BACKGROUND
 

 Plaintiffs, Robert and Kenneth Kuebel (“the Kuebels”),
 
 [1]
 
 leased property located at 123 Metairie Road to Charvet’s Garden Center, Inc. (“Charvet’s”), one of the defendants, for operation of a retail nursery. The initial lease, which commenced on March 1, 1996, was for a term of sixty months with monthly rental payments of $4,200 per month. Pursuant to an option contained in the lease, on March 1, 2001, the lease was renewed by Charvet’s for another sixty months with monthly rental payments of $5,200 per month. The lease, as renewed, called for an expiration date of February 28, 2006. The leased property contained two ^buildings, a large building which housed Charvet’s retail business, and a smaller building used for storage.
 

 According to testimony elicited at trial, Charvet’s was owned by Marilyn Charvet (“Marilyn”) and her husband, Carol Char-vet (“Carol”), with them children, Winston Charvet (‘Winston”) and Michele Charvet (“Michele”), being minor stockholders in the corporation. Charvet’s also owned and operated a garden center located on Clear-view Parkway in Metairie, which was run by Michele. The second garden center located on Metairie Road in Metairie, referred to as “Charvet’s Garden Center number 2,” which is the subject of this suit, was run by Winston. Although each location maintained separate bank accounts, Marilyn did the bookkeeping, payroll and accounting for both locations.
 

 Charvet’s Garden Center number 2 located at 123 Metairie Road operated continuously under the lease, originally and as
 
 *888
 
 renewed, until it closed on August 28, 2005 prior to the arrival of Hurricane Katrina (“Katrina”). On October 15, 2005, Winston gave notice to the Kuebels that he was canceling the lease due to damages resulting from Katrina.
 

 On November 3, 2005, the Kuebels filed a petition naming Charvet’s, Winston and Carol as defendants, alleging that the premises were not unfit for occupancy and operation of Charvet’s business. The Kue-bels sought to recover the remaining payments under the lease as well as insurance payments made for damages to the property resulting from Katrina.
 
 [2]
 
 In them petition, the Kuebels also sought a writ of sequestration on Charvet’s movables to enforce their lessor’s lien. In their pretrial order, the Kuebels alleged that damages to the property caused by Katrina was negligible in contrast to the damages that cu-mulated during Charvet’s [,,occupancy of the property. Specifically, the Kuebels alleged that Charvet’s failed to maintain the roof, allowing water to leak into the structure, failed to treat termites, and abandoned the building in a condition that left it exposed and subject to rapid decay. The Kuebels sought recovery of the damages to the property due to Charvet’s neglect, lost rental revenue from the lost opportunity to obtain rental income, as well as attorney’s fees and interest.
 

 Prior to trial, the defendants moved for summary judgment arguing that there were no genuine issues of material fact because its termination of the lease was proper under paragraph 23 of the lease. The defendants also requested that Winston and Carol be dismissed personally from this action because they did not execute or guarantee the lease personally. The trial court denied summary judgment on the issue of whether the lease was properly terminated and granted summary judgment dismissing Winston and Carol individually from the suit. The Kuebels moved for a new trial on the issue of personal liability and the trial judge stated that he would rule on the motion following a trial on the merits.
 

 At trial, the Kuebels presented the testimony of Paul Rester, an independent insurance adjuster. Mr. Rester testified that he inspected the subject property on July 7, 2006 and again on September 7, 2006. He took numerous pictures of the property and authored a report, all of which were admitted into evidence. On the outside of the building, Mr. Rester noted evidence of vine growth on the building and the roof, deterioration of the overhang, gutters that were rusting and hanging down, as well as rotten shutters lying on the ground. On the interior of the property, Mr. Rester noted water stains on the ceiling with a portion of the ceiling collapsed, torn drywall on one wall, heavy mold and mildew, and water on the floor. The pictures taken by Mr. Rester indicated a vine was also growing on the interior of the building through a window unit air conditioner. He also noted | r,vermin damage that he thought was caused by rats. On cross-examination, Mr. Rester admitted that he did not visit the premises prior to July 7, 2006. Also, he could not identify the vine vegetation, nor did he know its rate of growth. He admitted that the mold could have manifested itself after Katrina and that some of the damage could be due to vandalism. He testified that there had been “no upkeep” on the property.
 

 Kenneth Kuebel testified that when his father passed away in 1969, the property was passed to his mother and he and his
 
 *889
 
 six siblings. He explained that the larger building, referred to as building one, was built in 1945 or 1946, and that the smaller building, referred to as building two, was built in 1972 or 1973. The property was restored in the early 1970s. Prior to being leased to Charvet’s, the property was occupied by other tenants, including Kenneth and his brother Robert. When Charvet’s leased the property, one tenant, a doctor, remained and the other tenants moved. Kenneth testified that he drafted the lease to Charvet’s, which was admitted into evidence, and met with Carol three or four times to negotiate the lease. The lease provided that Charvet’s had permission to tear down the smaller building on the property. Kenneth explained that he would not have leased the premises without Carol’s signature and his intent was to bind Carol financially in the event of a default on the lease. The lease required the tenant to maintain the property. On cross-examination, Kenneth testified that the large building had a flat roof. He explained that flat roofs are not desirable in our climate because they expand and contract due to changes in the temperature which causes the roof to become brittle. Kenneth testified that about ten years after the roof was placed, the Kuebels had to do some minor maintenance which included re-tarring one area of the roof. Kenneth also testified that the Kuebels performed maintenance on the | (iproperty when the lease with the prior tenants was in effect, and that the property was in good condition when it was leased to Char-vet’s.
 

 Robert Kuebel testified that the larger building, referred to as building number one, was constructed of brick with an interior wood frame and sheetrock walls. The smaller building, referred to as building number two, was a steel building. Winston previously operated a business across the street from the Kuebel property and when the property that Winston was occupying was sold, Winston inquired about leasing the Kuebel property. Carol and Winston inspected the Kuebel property prior to signing the lease. Building number one was in very good condition prior to the Charvet’s lease and to Robert’s knowledge, there were no rotting boards, holes in the wall, holes in the ceiling, or roof leaks, and the central air-conditioning in the building was operable. Robert further stated that prior to the Charvet’s lease, there were no leaks in building number two, nor were there any holes, missing roof, or broken windows. Also, there were no termites in the buildings, and prior to leasing the property to Charvet’s, the roof was kept in good repair. Robert admitted, however, that he did not have any records to document any maintenance or repairs. Robert stated that he passed the premises frequently during Charvet’s occupation of the property and he never expressed any displeasure as to any lack of maintenance on the property. Robert denied knowledge of Charvet’s right to tear down building two if it desired, but testified that under the lease Charvet’s had to maintain that building because they used it.
 

 Robert further testified that he went to the premises after Katrina and “saw the disaster.” He took pictures that were admitted into evidence. These pictures depict water damage and missing sheetrock on the ceiling, mildew, broken windows, trash, torn sheetrock on the wall, roof rot, termite damage, fallen gutters, and vines growing on the building. The pictures showed window air-conditioning 17units that Robert states were not present prior to renting to Charvet’s. The central air-conditioner system was not maintained. Everything including mechanical, electrical and walls of the building were destroyed. He admitted that the electricity was never turned on after Charvet’s vacated the property so he did not know if the central air-conditioning system worked. Robert
 
 *890
 
 testified that he took these pictures because he saw the disaster and “total destruction” and wanted to prove this was not there when he left the building. In March 2007, the buildings subject to the Charvet’s lease were demolished because they could not be rebuilt. There were two rental houses on the property that were destroyed by Katrina. These houses were also demolished at the same time as the buildings leased to Charvet’s.
 

 In October 2005, when Winston told him he was packing up and moving from the premises, Robert told Winston that he had to pay for the remainder of the lease. On October 18, 2005, Robert presented a letter to Carol, which Carol signed, stating that “you are now in default of your lease.” At that time, Carol told Robert that Char-vet’s would pay the rent. When Robert later met with Carol to collect the rent, however, Carol told him Charvet’s did not have to pay the rent. Also, Robert testified that he talked to Federal Emergency Management Authority (FEMA) about leasing the premises and that the Kuebels held the property for FEMA for four months. Robert estimated that after Charvet’s vacated the property, it could have been rented for $20,000 per month if the property had been in the same condition as it was at the inception of Charvet’s lease.
 

 Winston was called as a witness by the Kuebels as the corporate representative of Charvet’s. Winston was questioned regarding his prior deposition testimony in which he testified that Charvet’s Garden Center number 2 was a partnership between he and his parents. Winston testified that he received all of the profits from Charvet’s Garden Center number 2, explaining that |sCharvet’s owned Charvet’s Garden Center number 2. Prior to leasing the Kuebel property, Winston operated the business across the street from the Kue-bel’s property and he had signed the lease for that prior location. Winston testified that he was aware that Robert wanted his father, Carol, to sign the lease from the Kuebels. Winston stated that he maintained the property and patched leaks on the roof as they occurred. He kept roofing material in a storage room and performed the repairs himself. In 2001, the roof of building one was damaged by a hailstorm. An insurance claim was made and these funds were used to repair the roof. Winston further testified that building one needed a new roof before the inception of the lease.
 

 Winston also testified that he routinely sprayed for subterranean termites. In 2001, however, the building was found to be infested with Formosan termites. Although he could not produce any documents to evidence payment, Winston testified that he hired someone to treat this infestation.
 

 James Morgan, who was accepted as an expert in general construction and contracting, testified that he inspected the subject property on three occasions in early 2006. He found the property in poor condition, noting that the ceiling had drooped on the floor, the sheetrock was wet and molded, there was water around the air-conditioning system, and there was rotten wood and termites. Mr. Morgan opined that the leaks in the roof had been ongoing for four to five years based on the extent of the rotten wood. In his opinion, the ceiling damage and termite damage predated Katrina. He opined that if the building had been maintained, it would have had another ten to fifteen years of useful life at the conclusion of the Char-vet’s lease. The damage to the building was too costly to repair. On cross-examination, Mr. Morgan admitted that he did not know if the central air-conditioning system was operable. He stated that the majority of the damage to the |flbuilding
 
 *891
 
 was from water, and that some of the moisture damage could have been from Katrina because the building leaked “real bad.” He did not think that the termite damage pre-dated the Charvet’s lease. Mr. Morgan admitted that there had been materials poured on the flat roof, but he could not tell how long it had been since the roof had been repaired. According to Mr. Morgan, most flat roofs last 12 to 15 years then have to be repaired.
 

 Kevin Vanderbrook, a civil engineer, testified that although he did not inspect the property, he examined pictures taken of the premises taken by Mr. Rester. Mr. Vanderbrook testified that the cracking on the roofs surface was the result of long term exposure. He explained that the photographs showed the fiberglass layer was visible which indicated a deterioration of the asphalt coating and felt paper that occurred over a period of five to ten years. He noted foliage on the roof which impedes drainage and resulted in leakage. He felt that the patches to the roof were ineffective. He did not see any holes in the roof that were related to hurricane damage that would have resulted in ceiling damage. In Mr. Vanderbrook’s opinion, the rotted wood and termite damage occurred over a period of years. He concluded that it was more probable than not that the damage to the building was due to neglect rather than to Katrina. On cross-examination, Mr. Vanderbrook stated that one would expect to see some cracking on a roof of this type within five to ten years of installation. He admitted that he did not know if there were roof leaks and stains on the ceiling prior to Katrina based on the photographs. He acknowledged that there were photographs that indicated a piece of metal flashing was damaged by wind which would have allowed water into the building.
 

 The Kuebels admitted the deposition of Paul Coffey into evidence. Mr. Coffey, an insurance adjuster, testified that he inspected the property in October |in2005 for the insurer of the premises. According to Mr. Coffey, there was a lot of debris on the roof that came from an oak tree next to the building. He stated that there was wear and tear on the roof that was unrelated to Katrina. Mr. Coffey admitted, however, that he wrote the insurance report to repair the roof because there was water coming in through the roof. He also noted water damage to the interior of the building, damage to gutters, and an exteri- or door, as well as termite damage. He did not think the building was a total lost; rather, he testified that the damages from Katrina were not significant. Mr. Coffey testified that the building could have been repaired.
 

 The defendants presented the testimony of Maureen Krail, Winston’s ex-wife’s sister. Ms. Krail testified that she worked at the Charvet’s Garden Center on Metairie Road in 1996. She testified that the property was dilapidated at that time and there were water stains on the ceiling. She testified that the ceiling was sagging which gave her the impression that it had been wet.
 

 The defendants also called Robert Ca-gle, an air-conditioning mechanic, as a witness. Mr. Cagle testified that he made numerous repairs to the air-conditioning system at the Charvet’s Garden Center on Metairie Road. Mr. Cagle’s invoices dating from May 1996 to May 2005 were admitted into evidence. Mr. Cagle explained that when he went onto the roof to work on the air-conditioning condensers, he did not notice anything unusual about the roof, nor did he notice any lack of maintenance on the building.
 

 G. Duane Crump testified that he was hired by Charvet’s to do renovation drawings for the property in 1996 because the building was in need of renovation at that
 
 *892
 
 time in order to meet the current building codes. Mr. Crump never inspected the roof, as his work did not include the roof. Mr. Crump stated that he|nvisited the site in question at various times and did not notice any deterioration in the property.
 

 Richard Regan, an attorney, testified that he spoke to Carol regarding termination of the lease. He drafted a letter that was sent via certified mail to Robert Kuebel that served as notification to the Kuebels that Charvet’s desired to cancel the lease based on the fact that the premises were then unusable for the purpose for which it was leased. The letter cited paragraph 23 of the lease which allowed either party to cancel the lease if there was a casualty during the last twelve months of the lease. Since the term of the lease expired on February 28, 2006, Mr. Regan concluded that Charvet’s had the right to terminate the lease.
 

 Carol Charvet testified that he signed the lease with the Keubels and that wrote his title as president of Charvet’s next to his name because he signed the lease on behalf of the corporation. He stated that he never intended to bind himself personally to the lease. He testified that Winston ran the Metairie Road Garden Center and is a 1% stockholder of Charvet’s. His daughter, Michele, also owns 1% of Char-vet’s stock and ran the Clearview location. Carol’s wife, Marilyn, owns 51% of the stock. Carol was then confronted with his prior deposition testimony that the Metair-ie Road store was an individual business with Winston as the owner. Carol explained that his deposition testimony meant that at the end of the year, Winston would get a bonus based on the profits of the Metairie Road store. At trial, Carol testified that Charvet’s owned both stores and taxes were paid on the two stores as one entity.
 

 Carol further testified that the Kuebel property was in “terrible shape” at the inception of the lease. After Katrina, Robert came by to collect the rent and Carol told him he had to speak to Winston. Carol stated that he then spoke to an attorney, who stated Charvet’s could get out of the lease. When Robert later met 112with Carol, Carol told Robert that they were going to close their Metairie Road location and terminate the lease.
 

 Avery Charvet testified that she started working at the Metairie Road Garden Center in January 1997 and married Winston in June 2000. She explained that during the time she worked at that location, Winston sprayed the premises for termites, but someone else came in to treat the premises for the Formosan termites. According to Avery, Winston repaired the roof when it leaked, and that after a hailstorm, considerable repairs were done to the roof. Avery explained that there was an aggressive vine that was growing on the property at the inception of the lease. This vine grew between the building and the concrete. She stated that they would cut the vine back and spray it with herbicides, but in would always grow back.
 

 Avery further testified that the interior of the Metairie Road store had to look attractive because it was a viable business. She stated that several times during the lease, they had to make repairs to the ceiling sheetrock. She explained that the central air-conditioning system never worked very well, so they placed window units in the building during the summer before Katrina. She testified that Robert came to the premises about four times a year and that she never heard any complaints from him about the condition of the property. After Katrina the building was a disaster. There was a big piece of sheet-rock that had fallen from the ceiling. It took weeks for them to clean the property. When they vacated the premises, they left the building “broom clean” as required by
 
 *893
 
 the lease. Avery reviewed pictures of the property taken by Mr. Rester, noting that the pictures were taken in September 2006, almost a year after they vacated the premises. She took note of the aggressive vines growing up the side of the building.
 

 113Winston Charvet returned to the stand and again explained that he was a shareholder and officer of Charvet’s. He testified that Robert wanted Carol to sign the lease rather than Winston because, in Winston’s opinion, Robert wanted to be sure they had the capital to perform the needed repairs in order to operate their business on the subject premises. Winston explained that at the inception of the lease, there were numerous renovations that had to be done to bring the building up to code and these renovations took about two and one-half months to complete. He testified that at the inception of the lease there were obvious problems with the roof and stains on the ceiling. During the duration of the lease, maintenance of the roof was a constant issue. He kept the materials to patch the roof on hand and performed the repairs himself when the roof leaked. In 2001, after a hailstorm, there was a major repair done to the roof. Winston explained that he did not have all of the cancelled checks and documents to show what was spent to repair the roof because he purchased some of the materials himself and some of his laborers assisted him with the roofing repairs. He also hired a roofing contractor, Lionel Bell, to put asphalt on the roof.
 

 Winston also testified that he treated the premises for subterranean termites but he hired someone to treat the Formosan termites when they were discovered. Winston stated that he “spruced up” the interior of the building on numerous occasions and painted the outside of the building twice during their occupancy of the premises. He stated that Robert had told him that the building would be torn down after his mother passed away. Winston testified that had the property not been damaged by Katrina, he would have renewed the lease when it expired in February 2006 because he ran a profitable business at this location.
 

 Winston further testified that after Katrina, there were tree branches on the roof of the building, broken water pipes, and debris all over. Sheetrock had fallen | l4down and there was water coming into the building. There was damage to doors and file cabinets. He testified that he could not have operated a business on these premises if the building had been in the condition depicted by the pictures. He explained that the damages depicted in the pictures were due to the hurricane. After Katrina, he sought advice from his ex-wife, who was an attorney. She advised him to send a letter to the Kuebels terminating the lease. Winston testified that he told Robert that they were going to move and terminate the lease and Robert stated that he wanted to rent the property to FEMA. Winston testified that he even spoke to FEMA about renting the property.
 

 At the conclusion of the trial, the trial judge took the matter under advisement. He then rendered judgment finding that Charvet’s had fully complied with the terms of the lease and had the right to terminate the lease under paragraph 23 of the lease. The trial judge further stated that the Kuebels failed to prove that Char-vet’s neglected to maintain the property in question pursuant to the terms of the lease. The trial court also denied the Kue-bels motion for a new trial regarding the personal liability of Winston and Carol. This timely appeal followed.
 

 ASSIGNMENTS OF ERROR ONE AND TWO
 
 — BURDEN
 
 OF PROOF
 

 In their first assignment of error, the Kuebels contend the trial court improperly placed the burden of proof on the
 
 *894
 
 them, as lessor, instead of allocating it between the parties. The Kuebels argue that once a loss is demonstrated, there is a presumption that the lessee’s negligence caused the damages and the burden of proof is shifted to the lessee, not the lessor. The Kuebels further argue that the trial court committed an error of law by improperly applying the burden of proof and contends this court must perform a
 
 de novo
 
 review and render judgment on the record. The Kuebels additionally argue that they offered uncontroverted testimony |iBand evidence proving that the Char-vets allowed termites to infest the building, failed to properly maintain the roof, and failed to undertake any meaningful maintenance of the premises as required under the lease. They contend that Char-vet’s offered little documentary evidence proving that the damages were caused by either Katrina or by neglect following their abandonment of the premises.
 

 Charvet’s responds that the Kuebels’ argument ignores the trial court’s factual Ending that “the Court received no credible evidence of the condition of the Property at the inception of the Lease.” Char-vet’s points out that building number one, which was built in the 1940s, was approximately 50 years old at the inception of the lease. This building contained a flat roof which needed periodic maintenance throughout the life of the building. Building number two was built in the 1970s. Charvet’s contends that there was substantial testimony that the condition of the premises was not very good at the inception of the lease.
 

 In support of its position, Charvet’s relies on
 
 Perroncel v. Judge Roy Bean’s Saloon, Inc.,
 
 405 So.2d 626 (La.App. 3 Cir.1981) and
 
 American Machinery Movers, Inc. v. Continental Container Service, Inc.,
 
 436 So.2d 1289 (La.App. 4 Cir.1983). We find these cases distinguishable from that of the case at bar. In
 
 Perroncel,
 
 the plaintiff sought to recover damages to specific items that were listed as inventory of the leased premises at the inception of the lease.
 
 American Machinery Movers, Inc.
 
 dealt only with damage to movable property, i.e. a forklift. More importantly, in both of those cases, the condition of the leased property at the inception of the lease was clearly established.
 

 Conversely, in the instant case, the evidence was clear that the leased premises consisted of two older buildings. Building number one was some fifty years old with a flat roof. While building number two was only about 25 years old, | lfiit apparently was in a state of disrepair since the inception of the lease, as Charvet’s was given the option of tearing it down. Additionally, while Kenneth and Robert testified that building number one was in good condition at the inception of the lease, the architect, Mr. Crumb testified that the building needed extensive renovation. Also, Ms. Krail and Carol testified that the property was in poor shape at the inception of the lease. Winston explained that significant capital was needed to renovate the property in order to operate the business at this location and that was the reason Robert required that Carol sign the lease. Moreover, Kenneth, who ran a construction business, testified that flat roofs are not desirable in our climate because they expand and contract with changes in the weather which caused cracks. Robert testified that this roof was replaced in the early 1970s and repaired about ten years later. Robert testified that prior to the lease to Charvet’s, the roof was kept in good repair but he did not have any records to document said repair. Furthermore, Mr. Morgan testified that a flat roof only lasts 15 to 18 years at the most. Thus, the evidence presented shows that at the inception of the lease, building number one had a flat roof that had reached its life expectancy. Additionally, Winston and
 
 *895
 
 Avery testified that substantial repairs were performed on the flat roof in 2001.
 

 As noted above, the reasons for judgment state that the “Court received no credible evidence of the condition of the property at the inception of the lease.” Clearly the trial court rejected the Kue-bels testimony that the building was in good condition at the inception of the lease and found that extensive renovations had to be done by the Charvets in order to establish its business on the property to be more credible. Accordingly, because the Kuebels did not establish the condition of the property at the inception of the lease, the burden of proof never shifted to the defendants to prove that damages to the building was not caused by their 117negligence. Hence, the trial court did not err in finding that the Kuebels failed to prove that Charvet’s neglected to maintain the property pursuant to the terms of the lease.
 

 In their second assignment of error, the Kuebels argue the trial court erred in finding they failed to prove that Charvet’s failed to maintain the property pursuant to the terms of the lease. The Kuebels contend that the trial court ignored the overwhelming evidence that the damages were caused by years of neglect at the hands of Charvet’s and that the premises were damaged beyond repair due to Charvet’s neglect. In support of this position, the Kuebels cite the testimony of their experts, Mr. Morgan and Mr. Van-derbrook, that the majority of the damage to the property was due to Charvet’s neglect. They also cite the testimony of the insurance adjuster, Mr. Coffey, that the damage from Katrina was not significant.
 

 A trial court’s findings of fact will not be disturbed on appeal unless the reviewing court finds that they are clearly wrong or manifestly erroneous.
 
 Stobart v. State, Through Dept. of Transp, and Dev.,
 
 617 So.2d 880 (La.1993);
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989). This standard of review does not allow the appellate court to reweigh the evidence or substitute its own factual findings.
 
 Salvant v. State,
 
 OS-2126 (La.7/6/06), 935 So.2d 646, 650. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or plainly wrong.
 
 Id.
 

 In order to reverse a trial court’s factual determinations, the appellate court must find that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. When findings are based on determinations regarding the credibility of a witness, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings.
 
 Schexnayder v. Exxon Pipeline Co.,
 
 01-1236, p. 6 (La.App. 5 Cir. 3/13/02), 815 So.2d 156, 160. A trial court’s factual findings that are based on credibility determinations can virtually never be manifestly erroneous or plainly wrong.
 
 Sal-vant, supra; StobaH v. State, stqrra.
 
 As explained in
 
 Rosell, supra
 
 the reason for this standard is because only the trier of fact can be aware of the variations in character and tone of voice that bear so deeply on the listener’s understanding and belief in what is said.
 

 Additionally, the trial court is not bound by the testimony of an expert; rather expert testimony is to be weighed the same as any other evidence.
 
 Fountain v. Fountain,
 
 93-2176, p. 5 (La.App. 1 Cir. 10/7/94), 644 So.2d 733, 738. A trial court may accept or reject in whole or in part the opinion expressed by an expert.
 
 Id.
 
 The effect and weight' to be given to expert testimony is within the broad discretion of the trial judge.
 
 Williams v. Rubicon,
 
 2001-0074 (La.App. 1 Cir. 2/15/02), 808 So.2d 852, 858.
 

 
 *896
 
 Winston and Avery testified that periodic maintenance and repairs were performed on the building during their occupancy. They explained that as a retail store, in an affluent area, the interior had to look presentable for customers. The evidence and testimony clearly established that the retail business was in operation until it closed for Katrina. Additionally, Robert admitted going into and driving by the building at various times throughout Charvet’s occupancy and testified that there was no reason for him to go to the Charvets and express displeasure as to how they were maintaining the property. Furthermore, all of the pictures presented by the Kuebels depict the premises after Katrina, with some of the photographs being taken over a year later after the building was left with no measures taken to prevent water from entering the building through the damaged roof. Clearly the trial court used its discretion and rejected the testimony presented by the Kuebels’ experts that the damage depicted in the photographs was the result of neglect rather | ]9than the hurricane. Having found no abuse of that discretion, we find no error in the trial court’s determination that the Kuebels failed to prove that Charvet’s neglected to maintain the property pursuant to the terms of the lease.
 

 ASSIGNMENT OF ERROR NUMBER THREE
 
 — RIGHT
 
 TO TERMINATE THE LEASE
 

 In this assignment of error, the Kuebels argue that Charvet’s used Katrina as a ploy to terminate the lease and hide years of damage from neglect to the leased premises. The Kuebels contend it was the damage caused by Charvet’s’ neglect that rendered the premises unfit for occupancy rather than Katrina. They contend that paragraph 23 of the lease absolving the lessee from repairing damages caused by a casualty during the last 12 months of the lease must be read together with paragraph 19 of the lease that provides the damage must not be caused by the fault or neglect of the lessee. The Kuebels reason that taking these two paragraphs together results in a two-part test to cancel the lease — there must be damages caused through no fault of the lessee and the property must be damaged to such an extent as to render it unfit for occupancy.
 

 Charvet’s responds that the language in paragraph 23 stating “with regard to Paragraph 19 of this Lease and notwithstanding anything contained therein” means that paragraph 19 is not applicable to paragraph 23. Charvet’s contends that under paragraph 23 since there was damage to the property from a casualty that occurred within the last 12 months of the lease, Charvet’s had a right to terminate the lease. Charvet’s contends that proper notification of termination was given pursuant to paragraph 23.
 

 Pai-agraph 19 of the lease states:
 

 If through no fault, neglect, or design of Lessee, the premises are destroyed by fire or other casualty or damages to such an extent as to | ^render them wholly unfit for occupancy, then this lease shall be canceled. The premises shall be deemed “wholly unfit for occupancy” if the premises cannot be repaired within 120 days from the date of casualty or fire. If the premises can be repaired within 120 days from the date of fire or casualty and such fire or casualty is covered by Lessee’s insurance, then this lease shall not be canceled and Lessee shall notify Lessor, or its agent within 30 days from date of fire or casualty that Lessee will repair the damage and Lessee shall not be entitled to a reduction or remission of rent during the period of reconstruction.
 

 Paragraph 23 of the lease states:
 

 With regard to Paragraph 19 of this lease, and notwithstanding anything contained therein, Lessee shall not be re
 
 *897
 
 sponsible to so repair, and either part[y] may cancel and terminate this lease upon giving the other party 30 days prior -written notice of its desire to so cancel and terminate, if such fire or other casualty occurs during the last 12 months of the terms of this lease.
 

 The trial court found:
 

 The destruction caused by Hurricane Katrina was the reason for Charvet’s desire to cancel the lease. The Court finds that the defendant fully complied with the terms and conditions of the lease and that under Paragraph 23 of the lease the defendant had a right to terminate said lease. Hurricane Katrina is considered a casualty, it occurred during the last 12 months of the lease term, and it rendered the lease property “wholly unfit of occupancy”.
 

 Having previously determined that the condition of the premises following Katrina was not due to the fault or neglect of the defendants, we must determine whether the evidence supports the trial court’s finding that Katrina rendered the property “wholly unfit for occupancy.” Winston and Avery testified as to the condition of the premises when they returned to the business after Katrina. Avery described the premises as a “disaster” with sheetrock falling down and water entering the building. Winston testified that there were branches on the roof, broken pipes, broken doors, and debris everywhere. Robert testified that he went to the premises and “saw the disaster.” Robert also testified that two rental houses that were located on the property were destroyed by Katrina. Thus, we find no |⅛1 error in the trial court’s finding that the damage caused by Katrina rendered the premises wholly unfit for occupancy.
 

 Under Paragraph 23 of the lease, if a casualty occurs during the last 12 months of the lease that renders the property wholly unfit for occupancy, either party can terminate the lease by giving the other party 30 days notice. There is no dispute that Charvet’s gave the Kuebels proper notice of their intent to terminate the lease and vacated the premises. Accordingly, we find that Charvet’s properly exercised its right to terminate the lease by giving 30 days notice to the Kuebels pursuant to the terms of paragraph 23 of the lease.
 

 ASSIGNMENT OF ERROR NUMBER FOUR
 
 — PERSONAL
 
 LIABILITY
 

 Having found no error in the trial court’s determination that damage to the leased premises was due to Katrina rather than the neglect of defendants, the plaintiffs’ assignment of error claiming the trial court erred in holding Winston and Carol were not personally liable for the condition of the premises is moot.
 

 CONCLUSION
 

 For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to appellants.
 

 AFFIRMED.
 

 [1]
 

 . The petition was filed by J.O. Kuebel, Joseph O. Kuebel, Jr., Jane lee K. Bosworth, Robert G. Kuebel, Elizabeth K. Lorber, executrix of the state of Conrad M. Kuebel, Jo Ann K Williams, Kenneth A. Kuebel and Eileen K. Weber. The appellants’ brief, however, refers to plaintiffs only as Robert G. Kuebel and Kenneth A. Kuebel.
 

 [2]
 

 . The record and testimony indicate that the insurance payment was made to Charvet's Garden Center, Inc. and the money for damages to the building located at 123 Metairie Road was later paid to the plaintiffs by the Charvet's.